MATSON NAVIGATION COMPANY, Plaintiff,

v.

John T. CONNOR, Secretary of Commerce, Defendant.

States Steamship Company, Intervenor Defendant,

San Diego Unified Port District, Intervenor Defendant.

Civ. No. 44080.

United States District Court
N. D. California, S. D.

Aug. 10, 1966.

Alvin J. Rockwell, for Brobeck Phleger & Harrison, San Francisco, Cal., for Matson Nav. Co.

Allen van Emmerik, Dept. of Justice, and Robert E. Kendrick, Dept. of Commerce, Washington, D. C., for John T. Connor, Secretary of Commerce.

James L. Adams, Edward M. Kovach, of Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for States S.S. Co.

Joseph D. Patello, Asst. Port Authority, San Diego, Cal., for San Diego Unified Port District.

## MEMORANDUM OPINION AND ORDER

WOLLENBERG, District Judge.

Matson Navigation Company has asked this Court to set aside Secretary of Commerce Connor's order (hereinafter S.C. D.) granting an application of the States Steamship Company, a subsidized operator, for permission to double its sailings (from 13 to 26) in the domestic California-Hawaii trade in competition with Matson, an unsubsidized exclusively domestic operator in that trade.[1] States Steamship Company (States) and the San Diego Unified Port District have joined the United States in opposing the motion as intervenor defendants. These defendants have filed cross motions for summary judgment in favor of the Secretary of Commerce. The issue before this Court is whether the Secretary's decision is supported by substantial evidence and whether it applied legal standards consistent with the Congressional intent embodied in the Merchant Marine Act of 1936.

States Steamship Company (hereinafter "States") operates a subsidized shipping service between California and the Far East. In January, 1961, States filed with the Federal Maritime Board[2] an application for permission under Section 805(a) of the Merchant Marine Act of

[1]. The Merchant Marine Act (the "Act") 46 U.S.C. §§ 1101–1294 as amended, provides for the subsidy of American ships in foreign operation if they meet certain requirements. Construction-differential subsidy (CDS) is paid to make the cost of United States built ships to the American-flag owner comparable to his foreign-flag competitor's overseas construction costs. 46 U.S.C. §§ 1151–1161. Operating-differential subsidy (ODS) is the subsidy paid to establish operating cost parity between contractors and their foreign-flag competitors. 46 U.S.C. §§ 1171–1182. States Steamships Company has received sizable amounts of dollar subsidy under both ODS and CDS provisions. Matson, an unsubsidized exclusively domestic operator in the California-Hawaii trade has received no subsidy for its operations in that area.

[2]. By authority of Reorganization Plan No. 7 of 1961, effective August 12, 1961, the Maritime Subsidy Board succeeded the Federal Maritime Board as to jurisdiction over the States Application herein.

1936, 46 U.S.C.A. Sec. 1223(a) to increase its intermediate service between California and Hawaii from 13[3] to 26 calls per year in each direction on the sailings of its subsidized ships on Trade Route 29, between California and the Far East. The Harbor Commission of the City of San Diego intervened in behalf of the applicant; Matson Navigation Company (hereinafter "Matson") and the State of Hawaii intervened in opposition. During the next five years, after the submission of the application, five different administrative decisions, some granting and some denying the application were issued respectively by the Hearing Examiner of the Maritime Commission (March, 1963), the Maritime Subsidy Board (Oct. 7, 1963), Secretary Hodges (Apr. 1964), Review Examiner (Mar. 1, 1964), and Secretary Connor (July 6, 1965)[4].

The case now has reached epic proportions in its duration and in the sheer volume of its certified record which could seemingly fill the largest hull of any of the carriers involved.[5] The conflicting administrative decisions reflect the general disagreement over the order of importance which the various avowed purposes of the Merchant Marine Act should be given. Somewhere in the numerous decisions rendered each party of interest was able to glean a supportive theory and attest to its justness in the light of reason and legislative history. However, since this Court need only consider the final order issued by Secretary Connor granting the application of States, it is unnecessary to discuss here the prior orders and recommendations by the other administrative officials except as they were expressly relied upon by the Secretary. All this Court can do with this case as it rests here on its long journey toward ultimate disposition is to test the Secretary's decision under the proper scope of judicial review.

This Court is mindful of its carefully restricted task in reviewing the Secretary's decision. While the Court is not obliged to stand aside and rubber

3. In January, 1953, States was granted permission under Sec. 805(a) to make 13 domestic calls at Hawaii in each direction. Pacific Transport Lines, Inc. Sec. 805(a) Application, Docket S–18 (Sub. No. 1). Matson made no objection to the original grant of 13 calls. It is only the 13 additional calls applied for in 1961 which are at issue in this case.

4. Briefly the history of the disposition of the disputed application below went as follows: In March, 1963, the Hearing Examiner served his Recommended Decision, concluding that to grant States' application would result in unfair competition to Matson and be prejudicial to the objects and policies of the Act. The maritime Subsidy Board took the decision under review, and in a Final Opinion and Order, (decided Oct. 7, 1963) the Board rejected the Recommended Decision and granted the requested permission. The Secretary of Commerce (then Hodges) decided on Jan. 6, 1964 to stay the Board's action and to review the Board's Opinion and Order. Secretary Hodges found on Apr. 23, 1964 that the Board's decision would be prejudicial to the objects and policies of the Act. Secretary Hodges however did authorize States to make the additional calls requested but subject to a condition that the right of refusal upon two weeks notice be given to the unsubsidized operators in the trade. In Dec. 1964 Secretary Hodges set aside his earlier decision and designated a Review Examiner to further consider the application. The Review Examiner concluded that no permission is required under 805(a) where a subsidized operator in foreign trade wishes to make intermediate calls at Hawaii on subsidized voyages, because Secs. 605(a) and 506 grant express permission for such mixed voyages and provide protection for exclusively domestic carriers through prorata reduction and refund of subsidy for the domestic portion of the mixed voyage. Exceptions to the Review Examiners decision were taken by Matson and Hawaii. The case then went to Secretary Connor (who had succeeded Secretary Hodges) for decision, against a background of four previous decisions at various administrative levels, two of which approved States' application and two of which denied the application.

5. The agency proceedings alone produced 7,718 pages of transcripts of hearings and testimony. Over 2,500 printed pages of written argument in briefs have been submitted along the line of review.

stamp its affirmance of administrative decisions, which it deems inconsistent with a statutory mandate, N. L. R. B. v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), it must at the same time guard against the danger of "sliding unconsciously from the narrow confines of law into the more spacious domain of policy." Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). Where findings of fact are concerned the scope of review extends only to an inquiry as to whether there is substantial evidence in the record to support them. The Court may not weigh the evidence anew and substitute its judgment for that of the Secretary. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 189, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959). As to any new standard of operation or policy judgment adopted by the Secretary in his decision, the Court must be satisfied that such standard is consistent with the authority and discretion granted by Congress. National Broadcasting Co. v. United States, 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344. The wisdom of the principle adopted is not this reviewing Court's concern as long as it has a definitely rational and statutory foundation. Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 207, 67 S.Ct. 1575, 91 L.Ed. 1995 (1946). Nevertheless where a newly adopted standard involves a major policy judgment as to the proper balance to be struck between conflicting interests, the Court must scrutinize it with care and strike it down if it results in an unauthorized assumption by the Secretary of major policy de-

cisions properly made by Congress. American Shipbuilding Co. v. N. L. R. B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

The Secretary's decision, herein challenged, granted States permission under Section 805(a) to increase its intermediate service between California and Hawaii from 13 to 26 calls per year on the sailings of its subsidized ships on Trade Route 29 between California and the Far East. In reaching his decision, the Secretary found that approval of State's application would not result in unfair competition to Matson within the meaning of Section 805(a) and that approval of State's application would not be prejudicial to the object and policy of the Act within the meaning of Section 805(a).[6] Matson has vigorously attacked both findings as being contrary to the policies of the Act, inconsistent with legal precedent, and unsupported by substantial evidence. This Court has carefully considered all of the arguments suggested by the protesting carrier Matson. However, for the reasons given below, the Court holds that the Secretary's findings are warranted by law, are supported by substantial evidence, and are clearly within the authorized discretion and statutory responsibility of the administrative agency.

The Secretary concluded that no unfair competition to Matson would result if States application were granted. In arriving at this conclusion, the Secretary conceded that States, the subsidized operator, would have a residual subsidy benefit to some degree supporting its domestic service (California-Hawaii). How-

---

6. Section 805(a) of the Merchant Marine Act of 1936, 46 U.S.C.A. Sec. 1223(a), forbids the payment of a subsidy to any person who, without written permission from the Board, owns or operates vessels "in the domestic intercoastal or coastwise service", which of course includes the California-Hawaii trade that States seeks to enter. Persons interested in an application for such permission are authorized to intervene before the Board and the Board is required to "give a hearing to the applicant and the intervenors". The Board is not to grant permission if the

Board "finds it will result in unfair competition to any person, firm, or corporation operating exclusively in the coastwise or intercoastal service or that it would be prejudicial to the objects and policy of this chapter." It is made a misdemeanor for one who has received such permission "to divert directly or indirectly, any moneys * * * used in foreign-trade operations, for which a subsidy is paid by the United States, into any such coastwise or intercoastal operation * * *".

ever, the Secretary maintained that "equalizing forces" such as statutory and contractual restrictions on States, "government aid in various forms to domestic operators" (Matson) and potential "growth in the trade" were to be weighed in the balance. (S.C.D. p. 53). The decision concludes that States' additional sailings would "not seem to pose a serious threat" and "would not have such a competitive effect on Matson as to lessen substantially the ability of Matson to compete for available cargo." (S.C.D. p. 63). Thus the Secretary, in defining unfair competition, adopted a new standard or test of "substantial competitive advantage" while applying Section 805 (a) to a subsidized carrier engaged in a "mixed voyage".[7] The ultimate disposition of this case depends almost totally on whether this new standard or test is consistent with the statutory mandates of Section 805(a) and whether its adoption can be rationally derived from the Congressional intent embodied in the Merchant Marine Act. As stated above, the establishment by an Agency of a new standard which involves such a major policy judgment must be closely scrutinized by a reviewing court against the statutory language, the legislative intent, and the applicable case law.

Turning first to the statutory language, Section 805(a) specifically requires the denial of permission for subsidized vessels to operate in the domestic trade if such permission would result in "unfair competition" to exclusively domestic operators. However, "unfair competition" is not defined in the Act. This is not unusual where a statute gives an agency a broad policy directive, such as the maintenance of both domestic and foreign water borne commerce and promotion of a merchant marine capable of serving as a naval and military auxiliary in time of war or national emergency. (Section 101 of the Act). In such cases it is customary to state the policy ends broadly and leave to the agency the adaptation of means to the desired end. Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 233, 63 S.Ct. 589, 87 L.Ed. 724 (1943), SEC v. Chenery Corp., 332 U.S. 194, 208, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), Swayne & Hoyt, Ltd., v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659 (1937), Mitchell v. Budd, 350 U.S. 473, 480, 76 S.Ct. 527, 100 L.Ed. 565 (1956).

Where general and imprecise terminology is inserted in a statute, the agency must have broad discretionary power to protect the multiple interests at stake.

Sections 506 and 605(a) of the Act contemplate exceptions to the general scheme of allowing subsidy for foreign operations only. These exceptions exist as to vessels on four specified kinds of mixed voyages, including vessels on "a voyage in foreign trade on which the vessel may stop at the State of Hawaii", providing subsidy is prorated according to domestic operation.[8] Yet Section 805

---

7. A mixed voyage is one on which the vessel is operated in both the domestic and subsidized foreign trades on the same voyage. The mixed voyage situation carries with it two inherent possibilities flowing from the proration formulas established by Secs. 506 and 605(a) of the Act, (providing for subsidy proration according to the degree of domestic operation) * * * There is first the possibility that proration will not remove all subsidy from the contractor's operations along the domestic portion of the mixed voyage but that a residue may remain as in this case. There is second the further possibility that such residual subsidy will exceed the contractor's need for support of his carriage of cargo in the foreign trade along the domestic portion of the mixed voyage. If so it would be available to help the contractor in domestic trade and, if large enough to create unfair competition or prejudice to the objects and policy of the Act, would require denial of the application. (S.C.D. pp. 35, 39–40).

8. Proration is the diminution of subsidy to a contractor engaging in a mixed trade. It is achieved by the refund of construction-differential subsidy (CDS) and reduction of operational-differential subsidy (ODS) according to statutory formulas

(a) directs the Secretary not to permit the operation of subsidized vessels in domestic waters if he "finds it will result in unfair competition" to exclusively domestic operators, or that it would be "prejudicial to the objects and policies of this Act." The three sections of the Act are not irreconcilable as some of the parties have contended. In sections 506 and 605(a) Congress clearly contemplated that Hawaii might be called at by subsidized vessels in the mixed trade, provided that their operators complied with the plan provided for subsidy proration. In Section 805(a) Congress added the further requirement that such mixed calls would not result in unfair competition for exclusively domestic operators. Thus the exclusive domestic operator is given a double protection from the subsidized carrier. First the subsidized carrier is required to return a portion of its ODS and CDS according to the statutory formula. If after the rebate there is still a residue of subsidy benefit in any form remaining, and if that benefit would be likely to result in unfair competition to the domestic operator, then the subsidized carrier is to be denied entry into the domestic market.

The Secretary in this case found that even after proration under 506 and 605 (a), there was some residual subsidy benefit to States. He, therefore, had to decide whether States residual subsidy benefit would result in "unfair competition" to Matson. He had to face for the first time the competitive situation presented by States mixed service. He con-

cluded that no unfair competition would result since the admitted competitive advantage arising out of the residual subsidy when tempered by certain equalizing factors would, in his opinion be insubstantial. In concluding that the statute permitted him to adopt the standard of "substantial competitive advantage" as the cutoff point for admissibility of subsidized vessels into the domestic waters, the Secretary rejected Matson's position urged before him on this point.[9] Matson contended that any subsidy at all (more than de minimus) which might remain to the subsidized applicant with regard to the domestic trade after proration under Section 506 and 605(a) had occurred would be per se unfair to unsubsidized operators in that trade regardless of equalizing factors. (Matson memo pp. 41, 48). In support of its position, Matson cited the legislative history and case law surrounding Section 805(a) which it construed to be at odds with the Secretary's new standard of unfair competition. The Court rejects Matson's contentions.

■ The purposes surrounding the enactment of the Merchant Marine Act of 1936 as announced by both the administration, the Congress and Section 101 of the Act were to promote and develop a strong American merchant marine to serve American shippers in time of peace, to provide for the continuance of neutral peaceful trade in time of war in which the United States was not involved, and to provide naval auxiliaries

set out in Sections 506 and 605(a) of the Act. 46 U.S.C. 1156 and 1175(a) respectively.

9. The Secretary in his decision also rejected the position advocated by States and adopted by the Review Examiner. States had urged that by including in Sections 506 and 605(a) of the Act provisions for subsidy proration Congress intended as a matter of law to eliminate in the mixed voyage type of case any question of unfair competition flowing from subsidy support of domestic operation by the applicant in competition with an unsubsidized operator in the same domestic trade. The Secretary said in his

opinion at p. 35: "to adopt the theory that, although 805(a) is assumed to apply, 506 and 605(a) subsidy proration provisions as a matter of *law* eliminate unfair competition from subsidy despite what the consequences may be as a matter of fact to the unsubsidized domestic operator, would imply an unawareness or a disregard on the part of Congress of the unfairness of situations even where substantial subsidy remaining after proration is used to significant advantage over an unsubsidized operator in a domestic trade. I am unwilling to imply such unawareness or disregard to Congress and I do not adopt the theory."

and the maintenance of necessary and commercial intercourse in time of war in which the United States was involved. Accordingly, the 1936 Act was primarily designed to develop the carriage of the nation's foreign commerce by United States flag vessels in time of war and peace through payment of construction subsidy and operating subsidy for use in competition with lower cost foreign flag vessels. Another important purpose of the Act was to promote the maintenance of an unsubsidized, privately owned merchant fleet sufficient to carry the nation's "domestic water-borne commerce" (Section 101 of the Act). In connection with this aim, Congress sought to curb abuses in the operation of the pre-1936 Government subsidy program, particularly the mail subsidies system. These abuses (which had harmed the unsubsidized operators) included "the improper operating of subsidiary companies, the payment of excessive salaries, the engaging in businesses not directly a part of shipping, and other abuses which have made for poor management, improper use of profits, and scattered efforts." (74th Cong., 1st Sess., House Document No. 118, March 4, 1935). The most common abuses in the domestic trade under mail subsidy were clearly shown by the legislative history to relate to two distinct types: (1) the creation by the recipients of mail subsidies of subsidiary or affiliate corporations to operate in the domestic trade and to which to pipe subsidy funds from the parent contracting firm, and (2) subsidy payment to and receipt by contractors who were almost exclusively domestic in their operations because they happened to touch at a foreign port incidental to their domestic routes.[10] The Black and Farley Reports which led to adoption of Section 805(a) recommended that subsidy not be paid to an operator whose business or interests are in the domestic trade nor for the benefit of any operator whose financial or corporate structure permits subsidy diversion into other than bona-fide American flag foreign-trade shipping enterprises. (Investigation of Air Mail and Ocean Mail Contracts. Senate Report No. 898, 74th Cong. 1st Sess. (1935, p. 14). In aggregate it may fairly be concluded that in addition to other primary objectives sought to be served, the Merchant Marine Act of 1936 was enacted to curb the many abuses disclosed by the Farley and Black Reports. It is also a fair summation of the legislative intent to conclude that Section 805(a) was intended to guard against potential abuses of the new ODS and CDS provisions contained in the 1936 Act.[11] How-

---

10. From 1920 to 1936 millions of dollars of Government mail subsidies were paid, pursuant to the Merchant Marine Acts of 1920 and 1928, for the presumed purpose of maintaining United States flag service on the foreign trade routes. As matters developed, however, a substantial part of the Government funds paid out was diverted into the domestic trade and into the pockets of steamship operators. These abuses were disclosed in a series of investigations held first by Postmaster General Farley and then by a special Senate committee chaired by Senator Hugo Black. Acording to the Farley Report, "millions of dollars of mail pay had been diverted from use in foreign trade and used to operate in intercoastal and coastwise trade resulting in unfair competition with nonsubsidized American lines in the same trade." (House Document No. 118, 74th Cong. 1st Sess.(1935) (p. 9). The Black Committee report was equally emphatic and stated:

It surely cannot be contended that Congress ever intended mail contracts to be let on links of intercoastal routes wherein the competition to be faced by the operator was only from other American interests. This was well known to Government officials administering the Merchant Marine Act of 1928, but despite that knowledge such contracts were let and are being operated. Thus there is placed in the hands of the favored contractor a murderous economic weapon to be used against his American competitors in a trade wherein vessels of foreign registry may not engage. (Investigation of Air Mail and Ocean Mail Contracts Senate Report No. 898, 74th Cong. 1st Sess. (1935, p. 14).

11. The concluding paragraph of Section 805(a) makes it unlawful and a misdemeanor—for a subsidized operator "to divert directly or indirectly, any moneys,

ever, there is nothing in the legislative history which requires the conclusion that Congress thought "unfair competition" necessarily would result from granting an 805(a) application to an operator seeking permission, while receiving subsidy, to serve one of the mixed foreign and domestic trades enumerated in Sections 506 and 605(a) when subsidy in any (for even something more than a de minimus) amount would remain, after proration, in the domestic segment.

■ To the contrary, it is quite reasonable to conclude from the Act and the legislative history that Congress did not regard a residual subsidy benefit in a mixed voyage as necessarily being unfair competition. Nowhere in Section 101 of the Act is there any suggestion of a policy against American-flag vessels promoting both the foreign and domestic commerce of the United States on the same voyage. In fact, Congress expressly showed its awareness of these objectives being obtained through such mixed voyages by providing in Sections 506 and 605(a) of the Act four specific and identical instances (including Ha-

waii) in which vessels engaged in such mixed foreign and domestic voyages would be eligible for both CDS and ODS, providing that CDS originally paid to the shipyard by the government was repaid by the ship operator and that ODS otherwise payable to the ship operator was reduced proportionately to such participation in domestic trade under a formula prescribed by Congress in those sections. The Defendant Secretary pointed out that these sections indicated Congress contemplated that it would be in the public interest for subsidized carriers to provide mixed service in those trades in some cases. (S.C.D. 73–74). It was even foreseen at the Congressional hearings that proration might not always remove all benefits of subsidy to an operator of a combination foreign-domestic service in competition with an unsubsidized operator in the domestic trade.[12] Aware of this possibility, Congress failed to promulgate legislation which expressly and specifically outlawed *any residual subsidy* [13] and instead adopted the broader standard of "unfair competition" embodied in Section 805(a). Accordingly,

property, or other thing of value, used in foreign-trade operations, for which a subsidy is paid by the United States," into any "domestic operation".

12. The Secretary referred to the fact that early drafts of Sections 506 and 605(a) containing refund and reduction of subsidy provisions, "resulted in protests by domestic operators on the ground of probable unfair advantages a subsidized operator would have in the mixed trades despite such protection." The Secretary said that the forerunners of Section 805 (a) were added as an additional protection to unsubsidized operators. (S.C.D. pp. 14–15). See also the testimony of J. C. Peacock, Director of the U. S. Shipping Board Bureau, Dept. of Commerce. Hearings on S 3500, Committee on Commerce, Senate, 74th Cong. 2d Sess. (1936) pp. 75–76, which reflects an awareness of potential residual subsidy:

Mr. Peacock: I think the provision that is made * * * 506 and 605(a) is the best that can be made under the circumstances. After all, this is theoretical. I would not assume to say

there might not be some cases where there was still some real discrimination left, and the importance of that has, I think to be judged in connection with what is the principal purpose of the bill.

The Chairman: Somebody might be pinched, but in case of a national emergency the national defense would be better preserved if we had ships, no matter where they operated in between times; is that your position?

Mr. Peacock: I think so, if that is the principal purpose of the bill.

13. Some of the bills introduced in Congress prior to enactment of the 1936 Act contained specific prohibitions against payment of subsidies to any carriers operating in the domestic trade. None of those provisions were retained in revised H.R. 8555, which became law. See H.R. 7854 (May 2, 1935) and H.R. 7981 (May 9, 1935).

the fairest reading of the provisions of the Act itself and the legislative history behind it indicate that because of the multiple purposes of the Act and because of the unforeseeable complexity and variety of competitive relationships which would be posed by applications under Section 805(a), Congress set forth no automatic or mechanical formulas and established no per se standards. Rather it entrusted the Secretary with considerable discretion in determining when unfair competition would result from a residual subsidy.

In reaching his decision, the Secretary carefully considered the opinion of the Court of Appeals for the District of Columbia in the *PFEL* case,[14] which is the only major case discussing unfair competition under Section 805(a). This Court agrees with the Secretary that the thrust of the *PFEL* case is its rejection of the doctrine of fundamental entitlement whereby domestic operators would be protected from competition which was not subsidized. Everything else in that opinion is dictum which in large part is inapplicable to the facts in this case. *PFEL* was not a mixed service case. It involved a subsidized operator's application for permission to operate unsubsidized vessels in domestic waters. There is no possibility in such a situation for residual subsidy passively to remain after proration from the subsidized operations to assist the separate unsubsidized operations. To the contrary, the case at bar presents the distinct situation of a mixed voyage with its inherent possibility of residual subsidy, without purposeful diversion. The Secretary's order is perfectly consistent with the language in *PFEL* relied on by Matson which broadly condemns "diversion of money to unsubsidized domestic operations from subsidized foreign operations, to the disadvantage of an unsubsidized operator".[15] That language merely reasserts the declared purposes of Section 805(a) to prevent deliberate shuffling of funds from subsidized to unsubsidized operations, and to ultimately provide substantial protection for domestic operators as against subsidized operators. The opinion in *PFEL* never considered, nor does the language embrace the unique mixed service situation specifically provided for in the Act by Sections 506 and 605(a). It never considered the degree or amount of inherent residual subsidy which might remain without disrupting the dual Congressional plan to sustain both the foreign and domestic trades. It directed its attention solely to the rejection of the doctrine of fundamental entitlement and to reaffirming the Congressional intent to prevent deliberate subsidy diversion. The Secretary correctly considered the *PFEL* opinion for what it was worth [16] when applied to "the mixed" voyage situation, and proceeded to adopt the standard of "substantial competitive advantage" as a test of unfair competition when dealing with a residual subsidy benefit to States.

As stated above, the Secretary was faced in this case with the relatively novel situation of a mixed service carrier having a residual subsidy benefit, increasing its domestic service. The factual makeup required the Secretary to define and apply the concept of "unfair competition" within Section 805(a) to a mixed service situation. Lacking any specific or express statutory language as a guide, the Secretary correctly looked to the over-all purposes of the Act and the legislative history surrounding it. Putting aside the extreme positions on both sides, the Secretary objectively con-

---

14. Pacific Far East Lines, Inc. v. Federal Maritime Board, 107 U.S.App.D.C. 155, 275 F.2d 184 (1960) Cert. Denied 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523.

15. Ibid. p. 186.

16. The Secretary commented at P. 39: "Again, bearing in mind the factual differences in the *PFEL* situation and in the situation involved in this proceeding, I think that the Court's indication there that competitive advantage from subsidy is a relevant factor in determining whether unfair competition would result from granting an 805(a) application is a relevant factor to the unfair competition issue here." (S.C.D. p. 39).

cluded that the Act was promulgated for the dual purposes of maintaining a highly effective Merchant Marine at all times and places (Section 101) while at the same time protecting the legitimate interests of exclusively domestic operators against the devious assault of subsidy diversion. [Section 805(a)]. Cognizant of these dual objectives and unrestricted by specific statutory mandate or judicial precedent, the Secretary correctly rejected a mechanical test of unfair competition. Rather, having concluded that the Act vested in him a wide range of discretion, the Secretary properly adopted a standard which was flexible enough to implement his discretion but restricted enough to substantially preserve in all cases the obvious protective intent of Section 805(a).[17] This Court, therefore concludes that the standard of "substantial competitive advantage" is the product of sound reason, administrative experience, appreciation of the complexities of the problem and a thorough understanding of the statutory policies, which in aggregate constitutes an allowable administrative policy judgment undisturbable on judicial review.

■ Having adopted this new standard of unfair competition under Section 805(a), the Secretary proceeded to find that if the application were granted States would not have a substantial competitive advantage over Matson as a result of its residual subsidy benefit. (S. C.D. p. 53) Matson has strenuously objected to this finding. This Court having affirmed the Secretary's new standard must only inquire as to whether the Secretary's factual finding was supported by substantial evidence. Minneapolis & St. Louis R. Co. v. United States, supra. The Court need not catalogue here the extensive findings set forth by the Secretary in his Order. (S.C.D. pp. 41–53), nor will the Court substitute its judgment for that of the Secretary. It is sufficient to state the Court is satisfied that the record reveals the Secretary reached his conclusions on the basis of substantial, relevant, and legally admissible evidence.

In determining that States would not gain a substantial competitive advantage over Matson, the Secretary properly took into account the respective roles of Matson and States in the California-Hawaii trade. (S.C.D. p. 41). He noted that the over all picture reflected that for many years Matson has been and is the predominant carrier in that trade. He found that Matson had been carrying nearly 1,500,000 tons of cargo annually in each direction in the trade, compared with States' (and its predecessor's) carryings ranging between only 7,926 and 22,430 short tons westbound and considerably less eastbound. He also found that Matson had been making up to 18 round voyages a month contrasted with about one a month by States. Additionally he found that other carriers entered the trade from time to time, but with little or no success against Matson's efficiency and established position. He concluded that Matson for a number of years past had carried about 98% of the cargo between Hawaii and the Pacific Coast, and that currently it was carrying about 95% of the liner cargo in the California-Hawaii trade.

■ Looking to the future, the Secretary stated that if States' application were granted and its annual calls increased by 13 in each direction, States' carrying in the California-Hawaii trade would increase by an estimated 67,000 tons annually westbound and 26,500 tons annually eastbound. (Ex. 4A, Item 10, pp. 1–2). For each sailing by States every two weeks, Matson would have about 14 sailings per month; in a year's time Matson would carry 22 times as much cargo as States. Expressed in percentage, the Secretary noted that the cargo which would be moved by States

17. The secretary rejected the Board's extreme statement that a finding of unfair competition must be based on evidence that the resulting advantage of the subsidized operator over the domestic operator is "such an overwhelming unconscionable advantage as to constitute 'unfair competition'." (SCD p. 40).

in the California-Hawaii trade on the additional sailings would be 5% of the total cargo moving in that trade. The Secretary then concluded on the basis of these findings (which were derived from the numerous exhibits and findings of the Board, Hearing Examiner, and Review Examiner): "that Matson has not had substantial competition in the California-Hawaii trade, and that the competitive situation would be changed to some, but not to a great, extent by granting States' application." (S.C.D., p. 43). The record clearly reflects that the Secretary's basic conclusion regarding the respective position of the two carriers at the time of the decision and in the future is supported by substantial evidence.[18]

 ▮  The total impact of States' additional service in relation to Matson's position in the trade is a proper factor to be considered in determining whether unfair competition would result.[19] It is true that under the Secretary's new test a near monopolist such as Matson is not entitled in all circumstances to as much protection from entry of subsidized operators into its waters as a small unsubsidized carrier in a tightly competitive market would have against the same subsidized operator. A slight subsidy benefit in the former case may serve the over all purpose of the Act while barely causing more than a ripple of competitive disadvantage; whereas in the latter case it could disturb the entire ebb and flow

of a given market. Nevertheless, this quantitative or relational approach would not always be determinative of the unfair competition issue. For example, if States were permitted to enter the California-Hawaii trade and to use diverted subsidy or residual subsidy to "skim the cream" of the domestic cargo in that trade, unfair competition might result even though a very small percentage of the total cargo were involved. On the other hand even if the amount of additional cargo carried by States in the California-Hawaii trade were held to be substantial that would not be equivalent to a determination that States, would have a substantial competitive advantage over Matson *because of residual subsidy*.

The critical question then in resolving the unfair competition issue is not how much cargo States will carry in relation to Matson, but how much cargo it will take away from Matson as a result of its residual subsidy benefit and the eventual impact of this loss upon Matson. The Secretary fully considered the various dollar figures of projected residual subsidy which were submitted to him. He accepted the Hearing Examiners basic finding that States California-Hawaii service would be unprofitable on a full absorption basis (S.C.D. p. 52). Matson is correct that the Secretary did not come to an exact dollar figure of residual subsidy benefit, and that he at times considered all 26 voyages and at other times only the additional 13.[20] Neither of

18. In its brief Matson quibbles with many of the subsidiary findings listed in the Secretary's decision (Matson Reply Memo pp. 40–41). Although admittedly there may be some legitimate disagreement over the actual statistics, the ultimate conclusion that the competitive situation would not be greatly altered is clearly supportable by the record.

19. The Federal Maritime Board had indicated in previous 805(a) cases that carriage by the applicant subsidized operator of only a small percentage of the total cargo movement in the domestic trade is not substantial competition to an exclusively domestic operator therein. States Marine Lines, Inc. Sec. 805(a) Application, 6 F.M.B. 378, 384 (1961), Pacific

Transp. Lines, Inc. Sec. 805(a) Application, 4 F.M.B. 146, 148 (1953).

20. The Hearing Examiner ruled and the Board and Secretary affirmed the proposition that the Secretary would only consider the additional 13 voyages for which States sought permission. The Secretary's primary duty was to consider the fairness of competition and the prejudice which might result from the 13 additional sailings. However, the Secretary did not ignore the reality that States already was making 13 calls pursuant to an earlier application. In determining the extent of competition which States would offer, the Secretary did consider the cumulative impact and the incremental effect. (S.C. D. pp. 42–43, 59). There were many oth-

these points however cast doubt on the validity of the Secretary's ultimate conclusion that the residual subsidy benefit would not give States a substantial competitive advantage. The Secretary had before him a wide range of figures which varied according to the method of accounting, the designation of items as fixed costs of doing business, and the technique of cost allocation. Faced with a number of acceptable accounting methods he was free to choose the figure which he considered most accurate as long as it was a reasonable figure which accorded with modern accounting practice. Congress did not dictate a single type of accounting technique with elaborate regulations as guidelines to the untangling of complex tax and subsidy allocations. The Court would have accepted any of the figures based on full absorption accounting. However, even if the Court had felt that the $1,200,000 annual figure offered by Matson was the only accurate portrayal of the subsidy residue, the Secretary's conclusion as to unfair competition would still be rational and supported by substantial evidence. For the Secretary pointed out that despite States subsidy crutch certain equalizing forces would operate to abate that advantage considerably. First, he alluded to the normal statutory and contractual restriction upon the subsidized contractor and, government aid in various forms and in substantial measure to domestic operators. (S.C.D. p. 53). Next he noted that the outlook for the California-Hawaii trade is one of growth —and that even by Matson's standards it is expected to continue to grow at a rate of from 1% to 2% each year. Using this projected growth figure · coupled with other findings concerning Matson's predominance in the trade as compared with States, the Secretary concluded that Matson would probably within 5 years

be carrying as much cargo as it did at the time of States application for 13 additional sailings.

In addition to the above findings which were clearly supportable, the Secretary, within the proper bounds of his discretion, predicted that effective competition would be increased modestly in the trade as a result of granting the application. (S.C.D. p. 53). He regarded this prospect as beneficial to the maritime trade and echoed the words of the Court in *PFEL* that "effective competition is not to be equated with unfair competition." To support this finding that effective rather than unfair competition would ensue, the Secretary had before him the conclusions of the Hearing Examiner Board and Review Examiner that States would not compete "fraudulently, in a cutthroat manner, or in a way that is unfair according to accepted generally applicable legal or ethical standards." (S. C.D. p. 39) He had good reason and ample testimony to believe that States would continue to adhere to the dominant carrier principle of following Matson's rates. (Transcript 319, 692–94). Furthermore, the Secretary found that, although States would offer available service for some high profit cargo, there was no basis to conclude that States would (in its increased California-Hawaii service) engage in an extensive "cream-skimming" operation to Matson's detriment. (S.C.D. pp. 60–62). Rather, States would in many cases provide welcome additional service and available sailing dates for West Coast shippers.

As an added protection and because the consequences of granting the application could not be determined with any degree of certainty, the Secretary provided in his order for an appropriate and expeditious review of all 26 States voyages at the end of a three year period. In the

---

er instances throughout the Order in which the Secretary weighed the cumulative effect of the 26 voyages. (S.C.D. pp. 33, 48, 49, 50, 51, 64, 75–77). Accordingly Matson's attempt at hanging the spectre of Brown Shoe Co. v. U. S., 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510

over States is futile. The Secretary under the new standard announced in this case—substantial competitive advantage— will necessarily review the over all competitive picture any time that an application for additional authority is submitted.

meantime the Secretary's conclusion must stand as it is amply supported by substantial evidence.

The Court also upholds without hesitation the Secretary's finding under Section 805(a) that the granting of the application would not do prejudice to the objects and policies of the Act. The wording of this requirement by its very nature confers the widest range of discretion upon the Secretary. Furthermore, although Matson has raised some serious questions concerning the Secretary's adoption of a new standard and his application of that standard to the unfair competition issue, its attempt to overturn the Secretary's conclusion on this issue is basically a last ditch attempt to revert to the obsolete doctrine of fundamental entitlement.

The thrust of the Secretary's conclusion is simply that the California-Hawaii trade will grow enough to accommodate both Matson as the predominant carrier and States the supplemental carrier. He found no reason to accept Matson's dour prediction that a direct repercussion of States additional service would be an increase of rates and curtailment of service by Matson. The evidence pointed to the greater likelihood of a decrease in rates. He had previously rejected the accusation that States would confine itself to "cream skimming" operations.[21] He further concluded that he could deal with any ensuing inadequacy in States Far East service if that situation should appear. In aggregate, the protesting carrier Matson was resorting to raising every possible detrimental effect which *might* follow a grant of 13 additional calls to States. The Secretary had substantial evidence to reach contrary conclusions. However, if the future developments in the trade proved him incorrect, the Secretary added the built-in provision for expeditious review within a three year period of all 26 voyages.

On the other hand, the Secretary foresaw considerable benefits to the objects and policies of the Act as a result of States additional entry into the domestic trade. Although it is true that Matson's carrier service is on the whole adequate to meet the needs of most Hawaiian shippers, it is undisputed that there exists a definite need for better service westbound in some types of cargo[22] (e. g. auto dealers, household goods, fruit products, Transcript 878, 1119, 3568). Additionally the intervenor defendant, Port of San Diego, testified that San Diego badly needed service to Hawaii which Matson did not provide. Both the Board and the Secretary found that permitting States to engage additionally in the California-Hawaii trade would not only furnish needed service to San Diego but would aid in meeting national defense requirements in facilitating the movements of military cargo from an important military base to outlying defense areas in the mid-Pacific and the Far East. (S.C.D. p. 67).

There is no doubt that Matson may suffer some temporary financial loss as a result of States additional service in the California-Hawaii trade. But

21. The Secretary found that it would be "reasonable to expect that with more frequent sailings shippers of general cargo would increasingly ship with States, and that its cargo mix would have a lower proportion than it now has of the enumerated high net revenue, more easily handled items." (S.C.D. p. 61). States as a common carrier would be obliged to accept any cargo offered to it. Thus with time States would be picking up the slack in service with a mixed cargo rather than "skimming the cream."

22. The Hearing Examiner noted that shippers of used automobiles had on occasion been unable to get space on Matson's vessels when they wanted it, although Matson had done much to alleviate that situation. (S.C.D. p. 64). The Board also referred to the unusually high utilization of Matson's capacity and complaints indicating that Matson's services do not fully meet the needs of many shippers. These findings all accord with the Secretary's determination that Matson ran a "tight service" and in view of the predicted growth in the trade, the public interest in general and westcoast shippers in particular would be greatly benefited by States additional service.

throughout the Secretary's order is the firm belief supported by evidence that temporary setbacks can be rectified by growth in the trade and more effective service. In the meantime a healthy dose of competition would be injected into the trade and the public interest will be better served. The unhealthy dependence of some shippers on Matson would be reduced. States additional service would remedy the tightness of Matson's closely run service and provide more adequate service to west coast shippers. If the increased competition results in a lowering of rates the public, including Hawaii, will benefit to a considerable degree. If the predicted growth in trade does materialize facilities will be available to accommodate the needs of increased cargo demands. The over all loosening of a near monopolist's grip on the State of Hawaii is fully in accord with the antitrust policy of this country. In weighing prejudice to the objects and policies of the Act, the Secretary was fully cognizant that what may be bad for Matson is not necessarily bad for the country and its merchant marine. Pacific Far East Lines, Inc. v. Federal Maritime Board, supra, 275 F.2d p. 186.

██ There is no cause for unsubsidized shippers to panic in fear of a sudden intrusion into their trade areas by subsidized operators. The Secretary was dealing with a specific situation in which possible benefits to the trade greatly outweighed the potential harm of a limited amount of subsidy residue. Unsubsidized operators will still receive substantial protection from Section 805(a). Permission to enter the domestic trade by a mixed service operator will only be granted as a final resort when adequate service by unsubsidized operators is unavailable. Therefore, it is the opinion of this Court that the dual purpose of the Merchant Marine Act to develop and protect both the foreign and domestic waterborne commerce is not only kept intact but is actually promoted by the Secretary's decision in this case.

In accordance with the above,[23] Matson's motion for summary judgment is denied, the cross motion for summary judgment by the intervenor defendants is granted, and the Secretary's Order granting the application of States is hereby affirmed.

---

**23.** The Secretary was free to discard administrative precedents as long as he fully explained the basis of his decision. The Secretary's Opinion can only be praised for its clarity, documentation and thoroughness. Since the Court believes that the Secretary's findings and analysis are more than adequate to support his decision, it is not necessary to discuss the other procedural objections offered by Matson.