MOVERS' & WAREHOUSEMEN'S AS-
SOCIATION OF AMERICA,
Inc., Plaintiff,

v.

UNITED STATES of America and the
Interstate Commerce Commis-
sion, Defendants,

PepsiCo, Inc., Spedco, Inc., and North
American Van Lines, Inc., In-
tervening Defendants.

Civ. A. No. 508–68.

United States District Court
D. New Jersey.

June 23, 1969.

Zelby & Burstein, New York City, for plaintiff.

David M. Satz, U. S. Atty., Newark, N. J., Edwin M. Zimmerman, Asst. Atty. Gen., Department of Justice, Washington, D. C., for United States.

Robert W. Ginnane, General Counsel, Washington, D. C., for I. C. C.

Shanley & Fisher, Newark, N. J., Irving J. Raley, Donald Macleay, Washington, D. C., for intervening defendants.

## OPINION

Before FORMAN, Circuit Judge, and SHAW and WHIPPLE, District Judges.

FORMAN, Circuit Judge.

This is an action based on a complaint brought by plaintiff Movers' & Warehousemen's Association of America, Inc., seeking to enjoin, annul and set aside an order of the Interstate Commerce Commission served on February 29, 1968, approving the acquisition of North American Van Lines, Inc. (NAVL) by Spedco, Inc., a wholly owned subsidiary of Pepsi-Co, Inc., in Docket No. MC-F-9463. The complaint also attacks the final order of the Commission in which it deferred exercise of the power sought in a concurrent application, Docket No. MC-F-9464, to substitute Spedco for NAVL in the latter's pooling plan and in which it provided that consummation of the

acquisition in No. MC-F-9463 should not take place until a proposed new pooling agreement was filed with the Commission.

The United States joined the Commission in the defense of this action. NAVL, PepsiCo and Spedco have intervened as defendants, and jurisdiction of this court is founded upon 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325 and 49 U.S.C. § 17(9). A brief description of the parties is essential to an understanding of the issues raised herein.

Plaintiff Movers' & Warehousemen's Association of America, Inc., is a non-profit organization of 577 independent motor carriers engaged in transporting household goods throughout the United States. Its major function is the publication of its members' tariffs with the Interstate Commerce Commission. Although its members vary in size, several are national "system carriers" operating primarily through local agents.

PepsiCo is a huge corporate structure engaged in many varied operations through five major subdivisions: (1) Pepsi Cola produces and distributes soft drinks throughout the United States; (2) Frito-Lay produces and markets snack or convenience foods throughout the United States; (3) PepsiCo International markets PepsiCo products in foreign countries; (4) Empire State Sugar refines and sells sugar, with refineries in Long Island City and Auburn, New York; and (5) Lease Plan International (LPI), PepsiCo's service division, which in turn has four divisions operating through fifty-six subsidiaries. In addition to leasing automobiles, trucks and trailers, LPI controls two contract carriers,[1] Beer Transport, Inc. and Relay Transport, Inc.; and three common carriers, National Trailer Convoy, Inc., Whitehouse Trucking, Inc., and Flagstaff Trailer Sales, Inc. Details of the operations conducted by these carriers will be discussed in connection with plaintiff's anti-trust arguments. Suffice it to say for the present, that all are subject to regulation in one form or another by the Interstate Commerce Commission.

Spedco is a wholly owned subsidiary of PepsiCo, created in 1966 for the express purpose of acquiring NAVL.

NAVL is a motor common carrier with nationwide Commission authority to transport household goods and limited authority to transport "new products" including furniture, office and household fixtures, office equipment, pianos and organs. In 1965 it ranked second among household goods carriers in the United States in terms of gross revenues. NAVL, like other major household goods carriers, including a large number of plaintiff's members, operates under an agency system wherein local representatives, many of whom themselves possess authority to transport household goods in a limited geographical area, solicit and accept shipments for the account of a national carrier.

On July 5, 1966 Spedco filed an application with the Interstate Commerce Commission, pursuant to § 5(2) (a) (i) of the Interstate Commerce Act,[2] seeking

---

1. At the time of PepsiCo's application to acquire NAVL, LPI controlled *four* contract carriers. However, the contract carrier permits of two of them, Food Transport, Inc. and Market Haulage, Inc., were voluntarily surrendered and revoked effective February 10, 1967.

2. 49 U.S.C. § 5(2) (a):
"It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—
"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more

authority to acquire substantially all of the assets and business of NAVL, and assume substantially all of its liabilities, in exchange for 318,409 shares of voting capital stock of PepsiCo having a par value of 33⅓ cents. On consummation of the transaction, NAVL was to change its name to North American Liquidating Corp., and dissolve, while Spedco was to change its name to North American Van Lines, Inc. No change in the operations and structure of NAVL was contemplated, and it was to continue to function with complete autonomy and independence from the other corporate subsidiaries of PepsiCo.

Spedco and NAVL simultaneously filed an application (No. MC-F-9464) under § 5(1) of the Interstate Commerce Act,[3] seeking the substitution of Spedco for NAVL in the latter's pooling agreement, previously approved by the Commission in No. MC-F-4551, North American Van Lines, Inc.—Pooling,[4] which provided for the pooling of traffic, service, and revenues among NAVL and its various carrier agents.

Both applications were referred to a Commission Hearing Examiner for hearing on a joint record. In addition to plaintiff, Aero-Mayflower Transit Company, Inc., Fernstrom Storage and Van

Company, United Van Lines, Inc., Mural Transport, Inc. and the Irregular Route Conference of the American Trucking Association, Inc. either filed timely protests or intervened in opposition to the acquisition application.[5] All except plaintiff withdrew at different stages of the proceedings. No protests were filed in No. MC-F-9464, the pooling application, and no evidence was introduced before the Hearing Examiner on this subject.

On August 23, 1967, the Examiner issued his Recommended Report and Order approving both the acquisition and the pooling applications. In pertinent part, the Examiner concluded that the acquisition

"(1) would not foster anti-competitive consequences contrary to the public interest and the national transportation policy; (2) would not create an environment in which preferences, discriminations, and unfair destructive competitive practices would obtain and flourish; (3) would result in little, if any, diversion of household goods and new products traffic from protestants * * *; and (5) would not have any substantial detrimental effect to the Nation's common carrier system of transportation.

carriers to acquire control of another carrier through ownership of its stock or otherwise; * * *."

3. 49 U.S.C. § 5(1) provides in pertinent part:
"Except upon specific approval by order of the Commission as in this section provided, and except as provided in paragraph (16) of section 1 of this title, it shall be unlawful for any common carrier subject to this chapter, chapter 8, or chapter 12 of this title to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; and in any case of an unlawful agreement for the pooling or division of traffic, service, or earnings as aforesaid each day of its continuance shall be a separate offense: *Provided*, That whenever the Commission is of opinion, after hear-

ing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earnings, or of any portion thereof, will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises: * * *."

4. 60 M.C.C. 701 (1955).

5. Approval of the application was supported by Global Van Lines, Inc. and Shamrock Van Lines, Inc.

"Affiliation of North American with Pepsico will provide the former with a more influential and substantial financial base which will be an entree of this specialized industry into a more stable economy. Pepsico would make available to North American knowledgeable management techniques and skills assuring more efficient service in the transportation of household goods and new products from which other carriers of the same commodities should benefit. * * * And subject to the conditions hereinafter enumerated the examiner concludes that the application in No. MC-F-9463, would be consistent with the public interest and the national transportation policy.

"The substitution of Spedco, and its successor-in-interest North American Van Lines, Inc., in lieu of North American in the pooling agreement, approved and authorized by this Commission in North American Van Lines, Inc.—Investigation of Control, *supra*, * * * will be in the interests of better service to the public, and of economy in operation, and will not unduly restrain competition, and the application should be approved and the examiner so concludes." [6]

After exceptions had been filed to the Hearing Examiner's recommended decision, Division 3 of the Commission, in a decision and order served on February 29, 1968, affirmed and adopted as its own the findings of fact and conclusions of law of the Hearing Examiner with certain exceptions.[7] With respect to the pooling application the Commission ruled that since NAVL's arrangement had been approved thirteen years earlier and it was "inconceivable * * * that all of the parties to that agreement would still have the same name and address and would still hold the same operating rights insofar as any of them were carriers," the new agreement as it would be adopted by Spedco would have to be filed with the Commission, bringing all of the relevant information up to date. Consummation of the acquisition transaction was not to occur until compliance with this mandate had been effectuated.[8] Plaintiff's petition for reconsideration was denied by Division 3, acting as an Appellate Division, in an order served on May 8, 1968.

The complaint in this court was filed on May 23, 1968, and pursuant to an order of June 4, 1968 a three-judge court was convened to hear argument. Plaintiff's motion for a temporary restraining order was denied on June 13, 1968.

Plaintiff defines the issues under consideration as follows:

"(a) Was the transaction involved in the Section 5 [acquisition] Application lawfully approved and consummated in the absence of an approved pooling plan?

"(b) Assuming, *arguendo*, that a pooling plan was not required to be approved as a condition precedent to approval of the Section 5 Application does the acquisition in this case violate the anti-trust laws and has the Commission adequately weighed and appraised the monopoly aspects and implications of this transaction?

"(c) Did the Applicants prove and did the Commission rationally find that approval of the Section 5 Application was consistent with the public interest?

---

6. Recommended Report and Order of Hearing Examiner, p. 34.

7. The Commission's only material exception for purposes of the instant case involved a condition imposed by the Examiner on approval of the acquisition to the effect that there was to be no leasing of automotive equipment between PepsiCo and its subsidiaries on the one hand, and NAVL and its agents on the other. Division 3 deleted this condition from the Examiner's report because it found that the record disclosed no discriminatory practices, or the reasonable likelihood thereof.

8. The proposed pooling agreement was filed with the Commission on June 13, 1968 and the transaction was actually consummated on the following day.

"(d) Did the Commission authorize unlawful dual operations?"[9]

 Initially, it is necessary to recall some of the fundamentals regarding judicial review of the orders and decisions of administrative agencies, in this case the Interstate Commerce Commission. Congress has entrusted the Commission with the primary role in determining the effect on the public interest of mergers and acquisitions of carriers subject to the Commission's jurisdiction. That the expertise of that body is far greater than that possessed by the courts is accepted, at least with respect to the economic complexities and technicalities inherent in the transportation and motor carrier industry. The economic wisdom of a given transaction is, therefore, not our concern, but rather rests in the informed judgment of the Commission. Essentially, it is the reviewing court's function to determine whether the Commission has complied with the applicable statutory standards and has founded its decision upon substantial evidence, considering the entire record. This is the whole of the judicial task; if the Commission has met these criteria, its decision must stand. These guiding principles have been repeatedly reaffirmed,[10]

and as recently as the 1968 Supreme Court decision in the *Penn-Central Merger & N & W Inclusion Cases.*[11]

### I. The Pooling Question

Plaintiff argues that the Commission's approval of the acquisition of NAVL by Spedco was unlawful because no new pooling agreement involving Spedco has been properly approved by the Commission in accordance with § 5(1) of the Interstate Commerce Act.[12] The Hearing Examiner, in denying plaintiff's motion to dismiss the acquisition application on this ground, concluded that since the pooling application merely sought to substitute Spedco for NAVL in an already existing arrangement, approval of such substitution was not a necessary prerequisite to approval of the acquisition transaction under § 5(2) (a) (i) of the Act.[13] The Examiner also took occasion to note that

"Notice of public hearing on both applications was issued by the Commission on September 9, 1966, and served September 16, 1966. Examination of applicants' witnesses with respect to the application in No. MC–F–9464 was afforded all parties at the initial hearing and the continued hearing. *No question was raised by any party*

9. Brief for Plaintiff at pp. 9–10. Plaintiff later raises another issue concerning the Commission's decision pursuant to 49 U.S.C. § 5(3), not to consider PepsiCo as a carrier for purposes of the accounting and securities provisions of the Interstate Commerce Act. This question will be discussed *infra.*

10. *See, e. g.,* Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 187–189, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Brotherhood of R. R. Trainmen v. United States, 272 F.Supp. 304, 306 (E.D.Pa.1968); Florida East Coast Ry. v. United States, 259 F.Supp. 993, 998–1000 (M.D.Fla. 1966), aff'd per curiam, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967); Smith & Solomon Trucking Co. v. United States, 255 F.Supp. 243, 249 (D.N.J. 1966); Cardinale Trucking Co. v. United States, 232 F.Supp. 339, 344 (D.N.J.

1964); Black Ball Freight Serv. v. United States, 223 F.Supp. 191, 194 (D.Idaho 1963).

11. 389 U.S. 486, 498–499, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968):
"With respect to the merits of the merger, however, our task is limited. We do not inquire whether the merger satisfies our own conception of the public interest. Determination of the factors relevant to the public interest is entrusted by the law primarily to the Commission, subject to the standards of the governing statute. The judicial task is to determine whether the Commission has proceeded in accordance with law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence."

12. 49 U.S.C. § 5(1). See note 3 *supra.*

13. 49 U.S.C. § 5(2) (a) (i). See note 2 *supra.*

*at these hearings regarding any defect either as to form or substance of the application in No. MC-F-9464."* [14]

The Examiner ultimately approved the substitution of Spedco for NAVL, "under currently effective contracts, agreements, and arrangements," taking notice of the Commission's 1955 approval of NAVL's pooling plan in Docket No. MC-F-4551. As noted previously, Division 3 of the Commission modified the Examiner's recommended decision to the extent that "a proposed pooling agreement as it would be adopted by Spedco and all other parties thereto" was required to be placed on file with the Commission before the § 5(2) transaction in No. MC-F-9463 could be consummated and the authority granted in No. MC-F-9464.

■ Aside from the consideration that what was involved in No. MC-F-9464 was only the substitution of Spedco for NAVL in an existing, previously approved arrangement, with no other change contemplated, plaintiff's argument that a full hearing on the application was required under the terms of the Administrative Procedure Act [15] borders, in the circumstances of this case, on the specious. Plaintiff and the other protestants had adequate notice that the pooling and the acquisition applications were to be considered together on a joint record, and full opportunity was afforded to cross-examine the witnesses supporting the application and to introduce other relevant evidence. It is thus clear that plaintiff had ample opportunity to challenge the contemplated pooling arrangement but failed to do so. Certainly, that failure can not be regarded as a basis for the granting of *another* hearing.

The decision in Brogan v. Pennsylvania Railroad Company,[16] apparently cited by the plaintiff for the proposition that any modification in an existing pooling agreement requires a plenary hearing before approval, is inapposite. In that case an agreement between the Pennsylvania and Pullman companies, which was found to have a substantial adverse effect on the employment rights of sleeping car porters, was actually a material revision of an existing agreement among the Pennsylvania and other railroads providing for pooling of service and revenues. In such circumstances Commission approval of the modified pooling plan on the basis of a full hearing was clearly warranted. On the facts of the instant case, however, it is apparent that the Commission desires only an updating of the relevant technical information contained in the previously approved agreement. It would appear that the mere filing with the Commission of the proposed agreement would satisfy the requirements of the decision under review and we agree that it suffices for the Commission's purposes. If there are any defects or improprieties contained in this pooling arrangement the Commission is empowered to initiate an appropriate investigation and enter supplemental remedial orders.[17] Plaintiff's argument that the Commission erred in approving the acquisition of NAVL by Spedco without initiating more elaborate procedures to test the pooling agreement leaves us unpersuaded.

## II. The Anti-trust Question

Plaintiff refers to a number of "economic facts" which it considers to have significant general anti-trust implications and which it alleges were not adequately weighed by the Commission in arriving at its decision. As background for its more particularized factual specifications, plaintiff points to the already existing oligopolistic structure of the household goods moving industry, in

14. Recommended Report and Order of Hearing Examiner, p. 3. (Emphasis added.)

15. 5 U.S.C. §§ 554, 556.

16. 211 F.Supp. 881 (N.D.Ill.1962).

17. 49 U.S.C. § 5(9) provides:

"The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7), of this section, as it may deem necessary or appropriate."

which NAVL presently plays a leading role. It is asserted that anti-competitive effects will now be increased since PepsiCo will be able to provide "virtually unlimited financing" to expand NAVL's market strength. This in turn will have an adverse impact on the competitive abilities of many of plaintiff's members, especially those whose operations are relatively small-scale, and will tend to even further limit access to a field where such entry is already made difficult by the strict regulation of the Commission.

Plaintiff's particular assertions of anti-competitive factors may be summarized as follows:

(1) LPI, the service division of PepsiCo, leases truck and automobile fleets and provides related services, to what are described as "blue ribbon national account shippers of household goods." NAVL is engaged in active competition for the household goods traffic of these large companies, and LPI, by offering reduced rental charges and other services at lower rates to such customers, will be able to divert large segments of the moving business to NAVL. "The ability of LPI and its affiliates to negotiate the price of their non-regulated services must inexorably result in captive tonnage for NAVL. No independent mover can compete with this kind of an operation." [18] Reciprocal dealing of this nature, plaintiff asserts, is proscribed by § 7 of the Clayton Act.[19]

(2) LPI, despite its assertions to the contrary, will be able to lease equipment, presumably under favorable terms, to NAVL. For example, National Trailer Convoy, an LPI subsidiary, can make available 800 tractors together with their owner-operators, thus greatly enhancing NAVL's competitive position. These tractors are described by plaintiff as "a major weapon in the arsenal of any mover." [20]

(3) NAVL will be able to offer financing of automotive equipment to potential agents on favorable terms, with the effect that it will be able to successfully solicit agents of other movers. Since the fortunes of these carriers are directly dependent on well-functioning agency systems, it is clear that the result will be devastating to the competitors of NAVL.

While it is readily apparent that the above economic charges are at best highly speculative, the Hearing Examiner gave careful consideration to all of the arguments based thereon. In an exhaustive and well-reasoned analysis of all of the possible ramifications of the proposed acquisition, the Examiner concluded that while both PepsiCo and NAVL were substantial organizations with eminent positions in their respective markets, neither was dominant and both were confronted with significant competition, with the consequent unlikelihood that the acquisition would result in a substantial decrease in competition or would tend to create a monopoly. He found no evidence on the record to sustain the protestants' fears that PepsiCo would divert the business of its subsidiaries to NAVL, and particularly emphasized that PepsiCo's subsidiaries were all separate and autonomous, engaged in heterogenous activities, with little opportunity thus being afforded for "intercorporate commercial activities." In this connection the Examiner noted that PepsiCo was willing to accede to a condition that there be no leasing of vehicles by PepsiCo or its subsidiaries to NAVL, or vice versa.[21] In response to

---

18. Brief for Plaintiff at 23. Along these lines, plaintiff also states that "[n]ot naivete but stupidity would lead one to believe that if LPI leases a large number of vehicles to a national account, NAVL will not have an unusual status, particularly since there is no regulation of lease rentals and the inducements to use NAVL's service may take the form of reduced lease rentals." *Id.* at 31.

19. 15 U.S.C. § 18. See FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

20. Brief for Plaintiff at 31.

21. As has been mentioned *supra*, the Commission subsequently deleted this condition on the ground that there was no evidence of discriminatory practices in the record.

the contention that NAVL, with Pepsi-Co's financial backing, would now be able to recruit agents to the detriment of its competitors, the Examiner pointed out that NAVL had always operated on the basis of one agent per location and had in the past provided financial assistance to these agents. None of this would be changed by association with PepsiCo. Further, PepsiCo consented to a condition ultimately imposed by the Examiner and adopted by the Commission providing that agents of PepsiCo and its subsidiaries would not serve or act as agents for NAVL, or vice versa. Finally, no evidence in the record was found to substantiate the assertion that LPI would engage in reciprocity practices so as to "sew-up" household goods transportation business for NAVL. This was considered to be a particularly unlikely eventuality in light of the practice common in the "national account" industries to permit their employees to choose their own carriers. Since choice of a mover was generally regarded as a matter involving the personal preference of the employee, due to individual sensitivities concerning the handling of personal possessions, the Examiner determined that it was at least doubtful that any company would attempt to intervene in order to influence that selection. In sum, the Examiner concluded that there were no serious anti-trust implications associated with the acquisition transaction, and his findings of fact and conclusions of law were adopted by the Commission.

Plaintiff's major line of attack in this court on the Commission's decision is rested on the asserted lack of compliance with recent Supreme Court decisions which allegedly narrow the de-cision-making powers of administrative agencies in passing upon acquisitions and mergers. Although the Examiner clearly considered anti-trust implications to be a relevant factor in a § 5(2) acquisition, he correctly concluded that they did not constitute the exclusive criteria.[22] The essential inquiry with respect to a proposed acquisition must be whether the transaction is in furtherance of the national transportation policy and is consistent with the public interest. As held by the Supreme Court in McLean Trucking Company v. United States,[23] the standards created by the anti-trust laws (in that case, the Sherman Act), while relevant, are not determinative:

"[T]he fact that the carriers participating in a properly authorized consolidation may obtain immunity from prosecution [§ 5(11)] under the anti-trust laws in no sense relieves the Commission of its duty, as an administrative matter, to consider the effect of the merger on competitors and on the general competitive situation in the industry in the light of the objectives of the national transportation policy.

"In short, the Commission must estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and *consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy.*"[24]

Plaintiff asserts, however, that the authority of the *McLean* holding was diluted by the 1950 amendment to § 7 of the Clayton Act.[25] Thus, it is con-

---

22. "Although it may be agreed that the anti-competitive aspects of a transaction under section 5 of the act, are elements that should be accorded consideration, it is not agreed that the standards of anti-trust statutes are the measure under section 5. Moreover, anti-competitive consequences are not the only factors, or even the controlling ones under section 5. Seaboard Air Line R. Co. v. United States, 382 U.S. 154 (156), 86 S.Ct. 277, 15

L.Ed.2d 223 [*sic*]." Recommended Report and Order of Hearing Examiner, pp. 21–22.

23. 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

24. *Id.* at 87, 64 S.Ct. at 380–381 (Emphasis added.)

25. 15 U.S.C. § 18.

tended, the anti-trust standards are now to play a more dominant role in the Commission's thinking, and emphasis is to be placed on the *potentiality* for anti-competitive effects resulting from a particular merger. Plaintiff's theory, however, flies in the face of the more recent Supreme Court decision in Minneapolis & St. Louis Railway Company v. United States [26] and Seaboard Air Line Railroad Company v. United States,[27] which specifically reaffirm the *McLean* principles in the Clayton Act context. This court is thus constrained to find that the Examiner and the Commission in the instant case properly applied the anti-trust laws, and the Commission's decision on this point is in all respects valid. Moreover, were we to assume that the applicable standard is that advanced by plaintiff, the evidence in the record does not suffice to establish even a probability of an anti-trust violation under § 7 of the Clayton Act. What is required is not mere speculation that substantial lessening of competition will result, but rather a "[p]robability of the proscribed evil." [28] That probability is not present in this case.

### III. The Dual Operations, Accounting and Securities, and Public Interest Questions

■ Plaintiff also argues that the acquisition will result in "dual operations" prohibited under the Interstate Com-

merce Act, in that PepsiCo, through its subsidiary LPI, will have control of several contract carriers as well as NAVL, a common carrier. This situation is allegedly fraught with possibilities of preferential treatment and discrimination working to the disadvantage of plaintiff's members, and in the absence of "special circumstances," should not be approved. In so asserting, plaintiff pays no heed to that provision of 49 U.S.C. § 310, which permits dual operations where the Commission finds same to be consistent with the public interest and the national transportation policy. That finding was made by the Examiner in this case on the basis of the totally dissimilar traffic carried by NAVL on the one hand, and the LPI subsidiaries, Beer Transport, Inc. and Relay Transport, Inc., on the other.[29] Plaintiff's contention on this point is clearly without merit.[30]

■ Plaintiff next argues that the Commission erred in exempting PepsiCo from the accounting and securities provisions of the Interstate Commerce Act. Under § 5(3) of the Act [31] the Commission is empowered to consider a noncarrier acquiring a carrier as itself being a carrier for certain purposes, including the accounting and securities provisions. The Examiner concluded that since PepsiCo's investment in and income from carrier operations would be relatively small even after the acquisition, it was

26. 361 U.S. 173, 186, 80 S.Ct. 229 (1959).

27. 382 U.S. 154, 156–157, 86 S.Ct. 277 (1965) (per curiam). *See* Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 492–493, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). *See generally* Florida East Coast Ry. Co. v. United States, 259 F.Supp. 993 (M.D.Fla. 1966), aff'd per curiam, 386 U.S. 544, 87 S.Ct. 1299 (1967).

28. FTC v. Consolidated Foods Corp., 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

29. Beer Transport is authorized to carry malt beverages and advertising material for Rheingold Breweries, Inc. in a limited territorial area, while Relay Transport,

Inc. is authorized to carry flavoring and syrup for PepsiCo and certain of its subsidiaries, likewise in a limited area.

30. Plaintiff relies on the broad language used by the Commission in Gallot-Purchase-Holst, 45 M.C.C. 1, 4–5 (1946) for support of its argument. It is to be noted, however, that the Commission there found that overlapping of authority to conduct both contract and common carrier operations resided in the respective parties to the proposed acquisition and would inevitably result in dual operations were the application to merge granted. The facts in the present case at bar scarcely support a reasonable suspicion of the same result here.

31. 49 U.S.C. § 5(3).

not required to comply with these sections.[32] In affirming, the Commission did not abuse its totally discretionary powers in this respect.

■ Plaintiff finally asserts that the Commission did not make an adequate finding that the acquisition of NAVL by Spedco would be consistent with the public interest. The Examiner determined that NAVL would be provided with a more substantial financial base as well as advanced management skills, resulting in more efficient service to the public. Contrary to the contention of the plaintiff such determination formed a substantial foundation for his conclusion, affirmed by the Commission, that the acquisition would be consistent with the public interest and further the national transportation policy.

The Commission committed no errors of law requiring reversal. Its findings and conclusions are fully supported by substantial evidence on the record as a whole. Accordingly, the Corrected Decision and Order of the Interstate Commerce Commission of February 9, 1968, approving the acquisition of NAVL by Spedco, under No. MC–F–9463 and the substitution of Spedco for NAVL in its pooling plan under No. MC–F–9464 is in all respects affirmed.

32. PepsiCo had expressed an intention not to go through with the transaction if it had to comply with the accounting and securities sections.