# MINNEAPOLIS & ST. LOUIS RAILWAY CO. *v.*
# UNITED STATES ET AL.

No. 12. Argued November 16–17, 1959.—
Decided December 14, 1959.*

*Together with No. 27, *South Dakota et al.* v. *United States et al.*, and No. 28, *Minnesota et al.* v. *United States et al.*, also on appeals from the same Court.

174

*Max Swiren* and *Harold J. Soderberg* argued the cause for appellants. *Max Swiren, John G. Dorsey* and *Richard Musenbrock* were on the brief for the Minneapolis & St. Louis Railway Co., appellant in No. 12; *Parnell Donohue,* Attorney General of South Dakota, *Herman L. Bode,* Assistant Attorney General, and *Ernest W. Stephens* for the State of South Dakota et al., appellants in No. 27; and *Miles Lord,* Attorney General of Minnesota, and *Harold J. Soderberg,* Assistant Attorney General, for the State of Minnesota et al., appellants in No. 28.

*Robert W. Ginnane* and *Starr Thomas* argued the cause for appellees. *Solicitor General Rankin, Acting Assistant Attorney General Bicks, Richard A. Solomon, Robert W. Ginnane* and *B. Franklin Taylor, Jr.* were on the brief for the United States and the Interstate Commerce Commission; *Grenville Beardsley,* Attorney General of Illinois, and *Harry R. Begley,* Special Assistant Attorney Gen-

eral, for the State of Illinois; *Starr Thomas, Carl E. Bagge* and *Edwin A. Lucas* for the Atchison, Topeka & Santa Fe Railway Co. et al.; and *Robert H. Walker* for certain municipalities and shippers et al., appellees.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

These appeals present questions arising out of rival applications by several rail carriers to the Interstate Commerce Commission under § 5 (2) of the Interstate Commerce Act [1] for authority to acquire control of Toledo, Peoria & Western Railroad Company.

---

[1] Section 5 (2) of the Interstate Commerce Act (24 Stat. 380, as amended, 54 Stat. 905, 49 U. S. C. § 5 (2)) provides, in pertinent part, that:

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for . . . two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise . . . .

. . . . . . .

"(b) Whenever a transaction is proposed under subdivision (a) of this paragraph, the carrier . . . seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify . . . [designated parties], and shall afford reasonable opportunity for interested parties to be heard. If the Commission shall consider it necessary in order to determine whether the findings specified below may properly be made, it shall set said application for public hearing; and a public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . . .

"(c) In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the

"Western" is an independent, short-line "bridge car-
rier"[2] of through east-west traffic by-passing the con-
gested Chicago gateway. Its line is about 234 miles long,
extending from its connection with the Pennsylvania Rail-
road Company ("Pennsylvania") at Effner, on the Illi-
nois-Indiana state line, westward, through Peoria, to its
connection with the main line of the Atchison, Topeka &
Santa Fe Railway Company ("Santa Fe") at Lomax, Illi-
nois, and thence southwesterly a short distance to Keokuk,
Iowa. Its headquarters, shops and yards are located in
East Peoria where it has 24 executives and where, and
elsewhere along its line, it has about 225 other employees.
It has connections for the interchange of traffic with 16
railroads, the principal ones being with the Pennsylvania
at Effner, with the Santa Fe at Lomax, and with the New
York, Chicago & St. Louis Railroad Company ("Nickel
Plate"), the Illinois Terminal Railroad Company, the

following considerations, among others: (1) The effect of the pro-
posed transaction upon adequate transportation service to the public;
(2) the effect upon the public interest of the inclusion, or failure
to include, other railroads in the territory involved in the proposed
transaction; (3) the total fixed charges resulting from the proposed
transaction; and (4) the interest of the carrier employees affected.
    "(d) The Commission shall have authority in the case of a pro-
posed transaction under this paragraph involving a railroad or rail-
roads, as a prerequisite to its approval of the proposed transaction,
to require, upon equitable terms, the inclusion of another railroad
or other railroads in the territory involved, upon petition by such
railroad or railroads requesting such inclusion, and upon a finding
that such inclusion is consistent with the public interest.

    "(f) As a condition of its approval, under this paragraph, of any
transaction involving a carrier or carriers by railroad subject to the
provisions of this chapter, the Commission shall require a fair and
equitable arrangement to protect the interests of the railroad em-
ployees affected. . . ."
    [2] The term "bridge carrier" appears to mean a short-line carrier
which transports through traffic from one long-line carrier to another.

Chicago, Burlington & Quincy Railroad Company ("Burlington") and the Minneapolis & St. Louis Railway Company ("Minneapolis") at Peoria. Its interchange connections with the other 10 railroads are at 17 other towns along its line.

Western has outstanding 90,000 shares of common capital stock, 82% of which is owned by the testamentary trustees of the estate of George P. McNear—Wilmington Trust Company and Guy Gladson—and the remaining 18% is owned by members of the McNear family, a bank and the president of Western. In 1954, the trustees determined to sell their Western stock, and rival efforts were commenced by Minneapolis, on the one hand, and by the Santa Fe and Pennsylvania, on the other hand, to purchase it. (Four of Wilmington Trust Company's directors were also directors of Pennsylvania.) Those negotiations culminated in a contract between the trustees and the Santa Fe, dated May 26, 1955, providing for the sale by the former and purchase by the latter of the stock at a price of $135 per share, subject to the Commission's approval.[3] Soon afterward, like agreements

---

[3] During the negotiations, Minneapolis first offered $69.50, and later $80, per share for the stock. On April 15, 1955, the Santa Fe and Pennsylvania each obtained letter commitments from the trustees for the sale to each of them of 26% of the Western stock at a price of $100 per share. (Near the same time the Rock Island made a like offer to the trustees for 26% of the Western stock, but that offer was not accepted.) But a dispute arose—and apparently still exists between the trustees and Pennsylvania—with respect to the validity of those commitments. Thereupon, Minneapolis offered the trustees $133 per share for the Western stock, but that offer was not accepted, and on May 26, 1955, the Santa Fe, acting, as the Commission found, "on behalf of that carrier alone," agreed with the trustees for the sale by the latter and purchase by the former of all the Western stock held by the trustees at a price of $135 per share, and those parties on that date entered into a contract, accordingly, subject to approval of the Commission.

were made by the Santa Fe with the holders of the remaining 18% of the Western stock.

On June 28, 1955, the Santa Fe entered into a contract to sell to the Pennsylvania Company, a wholly owned subsidiary of Pennsylvania, 50% of the outstanding capital stock of Western at $135 per share,[4] subject to approval of the Commission.

On July 8, 1955, the Santa Fe and Pennsylvania Company and its parent, Pennsylvania, applied to the Commission under § 5 (2) of the Act[5] for approval of

---

[4] The contract of June 28, 1955, between the Santa Fe and the Pennsylvania Company provided that it was without prejudice to any claims, causes of action or rights which Pennsylvania may have against the trustees of the McNear estate with respect to the letter commitment of April 15, 1955, for the sale by the trustees to Pennsylvania of 26% of the Western stock; and that, in the event Pennsylvania should acquire from the trustees, under that letter commitment, all or any part of such shares, the obligation of the Santa Fe under the contract to sell Western shares to the Pennsylvania Company was to be reduced accordingly. It appears that litigation was then, and is yet, pending by Pennsylvania against the trustees for the enforcement of the letter commitment of April 15, 1955.

The contract also contained a covenant which, in essence, provided that (1) Western "will continue to be operated as a separate and independent carrier with responsible management located along its lines in order to preserve to shippers and communities the present direct access to its officials," (2) that Western's properties will be maintained and improved, (3) that Western "will continue to maintain its own solicitation forces and will be entirely free to solicit traffic in such manner as best to serve the interests of" Western, (4) that all "existing routes and channels of trade via [Western] will be maintained and kept open without discrimination between connecting lines of railroad," and (5) that the Board of Directors of Western shall consist of 11 members, of whom one shall be the president of the company, two shall be officers of the Santa Fe, two shall be officers of the Pennsylvania Company, or Pennsylvania, or both, and the remaining six shall be prominent citizens not connected with either of the parties but selected by them through mutual agreement.

[5] See note 1.

those stock purchase agreements and the consequent joint control of Western. The Minneapolis intervened and objected to the application, as did also the States of Minnesota and South Dakota and their respective public service regulatory commissions.

Thereafter, on October 13, 1955, the Minneapolis applied to the Commission, under the same section of the Act, for authority to acquire sole control of Western, expressing its willingness to enter into contracts with Western's stockholders to purchase their stock at the same price and on the same terms as set forth in their existing contracts with the Santa Fe. The Santa Fe, the Pennsylvania Company and Pennsylvania intervened in the latter proceeding and objected to the Minneapolis application.

On motion of Minneapolis, the Commission consolidated the two proceedings. Thereafter, seven other railroads having interchange connections with Western's line intervened. Two of them sought authority, at all events,[6] and two others of them sought authority, under stated conditions,[7] to participate, under § 5 (2)(d) of the Act,

[6] The New York, Chicago & St. Louis Railroad Company ("Nickel Plate") and the Chicago, Rock Island & Pacific Railroad Company ("Rock Island") sought authority, under § 5 (2)(d) of the Act (see note 1), to be included in the acquisition of Western's stock on an equal basis with the successful applicant or applicants.

[7] The Chicago, Burlington & Quincy Railroad Company ("Burlington") and the Wabash Railroad Company ("Wabash") did not object to approval of the Santa Fe-Pennsylvania application, provided the order required continuation of present routes and channels of trade via existing junctions and gateways and of all existing traffic and operating relations and arrangements, but they asked, in the event any railroad other than the Santa Fe and Pennsylvania be authorized to acquire an interest in Western's stock, that they, too, be authorized to participate therein to the same extent as any such other railroad.

The Illinois Central Railroad Company ("Illinois Central"), the Gulf, Mobile & Ohio Railroad Company ("Gulf") and the Chicago & North Western Railway Company ("North Western") asked that,

in the acquisition of the Western stock on an equal basis with the successful applicant. The State of Illinois, 18 cities or towns and seven chambers of commerce located on or along Western's line, two labor organizations representing Western's employees, and a large number of shippers over Western's line, intervened in support of the Santa Fe-Pennsylvania application and in opposition to the Minneapolis application.

After an extended consolidated hearing before him, the Commission's examiner issued a proposed report recommending approval of the Santa Fe-Pennsylvania application and dismissal of the Minneapolis application. Thereafter, upon exceptions, and briefs and arguments in their support, Division 4 of the Commission issued its report. It was confronted, as it said, with four alternative proposals, (1) for authorization of joint control of Western by the Santa Fe and Pennsylvania, (2) for authorization of sole control by the Minneapolis, (3) for authorization of two other railroads, at all events, and of two more railroads, under stated conditions, to participate in the acquisition of the Western stock on an equal basis with the successful applicant,[8] and (4) denial of both applications.

The Commission observed that "[t]hese proceedings represent a new and more complicated phase in the administration of section 5, since [they involve] 2 applications for authority to control the same property, and petitions by 4 other carriers for inclusion in the transaction under varying circumstances." It recognized that, under § 5 (2)

---

if either application be approved, the order be conditioned to require the maintenance of all routes and channels of trade via existing gateways. The Monon Railroad Company asked that if the Santa Fe-Pennsylvania application be approved, the order contain a requirement that Pennsylvania shall grant to it certain trackage rights, and, if not done, that the Santa Fe-Pennsylvania application be denied.

[8] See notes 6 and 7.

of the Act and the National Transportation Policy,[9] it was required to "weigh whether each application is consistent with the public interest, with or without inclusion of other railroads, considering not only other intervening petitioners seeking such inclusion but also the other applicant and nonparticipating railroads as well." It thought that the burden of proof was "most heavy for an applicant in a proceeding like this, because it must not only overbalance the claims of those seeking to share in the control but also of those seeking to exclude it from the transaction." It conceived it to be its duty, under the Act and the National Transportation Policy, to "arrive at a standard of public interest and determine which of the various plans of control most nearly approximates it."

The Commission found that the Santa Fe-Pennsylvania plan contemplates that Western "will continue to be operated as a separate and independent carrier with responsible management located along its lines"; that it "will continue to maintain its own solicitation forces and will be entirely free to solicit traffic in such manner as best to serve the interests of the Western," and that all "existing routes and channels of trade via the Western will be maintained and kept open without discrimination between connecting lines of railroad." It found, on the other hand, that the Minneapolis plan "unequivocally contemplates the disappearance of the Western as an independent and neutral connection for the other 15 carriers with which it presently works"; that "[f]or all practical purposes the Western would be integrated, consolidated, and merged into the Minneapolis for ownership, management, and operation"; that features of the Minneapolis plan "would be extremely harmful to other carriers"; that Western's headquarters office at Peoria would be eliminated, leaving only a trainmaster and a roadmaster at

[9] 49 U. S. C., n. preceding § 1, 54 Stat. 899.

that point, and that the employment of most of Western's 24 executives and 225 other employees would be severed.

The Commission further found that "[o]nly the Minneapolis and its supporting interveners, the States of Minnesota and South Dakota, advocate the disappearance of the Western as a separate and independent operating carrier," and that all other parties to, and intervenors in, the proceedings "insist that the separate and independent operation of the Western under its present local management is a public necessity." It then found that the "[p]ublic interest demands that the present policies of the Western in all respects be continued." It thereupon made the ultimate finding, required by § 5 (2)(b) of the Act, that the acquisition and plan of operation by the Santa Fe and Pennsylvania, subject to stated conditions, was "within the scope of section 5 (2) of the Interstate Commerce Act, as amended; that the terms and conditions proposed [by them] are just and reasonable, and that the transaction will be consistent with the public interest." The Commission then entered its order approving the Santa Fe-Pennsylvania application, dismissing the Minneapolis application, and denying the petitions of the several intervening railroads which sought to participate in the acquisition of the Western stock. 295 I. C. C. 523.

Thereafter, Minneapolis petitioned the whole Commission for a reconsideration, and alternatively requested that, if the approval of the Santa Fe-Pennsylvania application be permitted to stand, it be authorized to participate equally with those railroads in the purchase of Western's stock on the same terms. That petition was denied.

Minneapolis then timely filed a complaint in the District Court for Minnesota against the United States and the Interstate Commerce Commission to vacate the Commission's order. The States of Minnesota and South Dakota and their respective regulatory commissions,

being interested in strengthening the Minneapolis, which operates in those States, intervened in support of the complaint. The defendants answered, asserting the full legality of the Commission's order. The Santa Fe, the Pennsylvania, the Pennsylvania Company, the State of Illinois, the 18 cities and seven chambers of commerce and the numerous shippers who were intervenors before the Commission, intervened in opposition to the complaint. The Nickel Plate intervened, complaining that the Commission had improperly denied its request to participate in the purchase of the Western stock.

A three-judge court was convened and, after hearing, rendered its opinion and judgment sustaining the Commission's order. 165 F. Supp. 893. On separate appeals by the Minneapolis, the State of Minnesota and its regulatory commission, and the State of South Dakota and its regulatory commission, the case was brought here and we noted probable jurisdiction. 359 U. S. 933. All of those who were defendants and intervenors in opposition to the complaint in the District Court, except the Nickel Plate, are appellees in this Court.

Minneapolis, supported by the States of Minnesota and South Dakota, contends, first, that the Commission improperly adopted at the outset of its report the standard of "separate and independent management" of Western as the criterion governing the comparative merits of the rival plans, which was antithetic to its application, and thereby deprived it of "fair comparative consideration," and that the District Court erred in · approving the Commission's action.

The record does not support that contention. Rather, it shows that the Commission's governing standard was the "public interest," although it ultimately did find that the public interest would be best served by Western's continued operation as a "separate and independent carrier." We believe that the recited findings show that the Com-

mission carefully "weighed" and considered "each application" in its labors to determine which, if either, of them was "consistent with the public interest." Its subsidiary findings (a) that the Minneapolis plan "unequivocally contemplates the disappearance of the Western as an independent and neutral connection for the other 15 carriers with which it presently works," (b) that certain features of the Minneapolis plan "would be extremely harmful to other carriers," (c) that the Minneapolis plan contemplates the elimination of Western's office and the separation of its employees, and (d) that numerous witnesses insisted "that the separate and independent operation of the Western under its present local management is a public necessity," fully support its conclusional finding that the "[p]ublic interest demands that the present policies of the Western in all respects be continued.". That finding, though antithetic to Minneapolis' application, did not deprive it of "fair comparative consideration," but, on the contrary, it seems to us, was made by the Commission after full and fair consideration, and the District Court did not err in so holding.

Appellants' principal contention appears to be that acquisition of control of Western by Santa Fe and Pennsylvania will create a combination in restraint of commerce in violation of § 1 of the Sherman Act [10] and will lessen competition or tend to create a monopoly in violation of § 7 of the Clayton Act,[11] and that the Commission's approval of their application was an abuse of power.

On their face these contentions would seem to run in the teeth of the language and purpose of § 5 (11) of the Interstate Commerce Act. That section, in substance, provides that "The authority conferred by this section shall be exclusive and plenary, and any carrier or corpora-

[10] 15 U. S. C. § 1, 26 Stat. 209.
[11] 15 U. S. C. § 18, 38 Stat. 731.

tion participating in . . . any transaction approved by the Commission thereunder, shall have full power . . . to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction . . . and any carriers . . . participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law . . . insofar as may be necessary to enable [it] to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction." 24 Stat. 380, as amended, 54 Stat. 908, 49 U. S. C. § 5 (11).

Section 5 (11) is both a more recent and a more specific expression of congressional policy than § 1 of the Sherman Act and § 7 of the Clayton Act, and in terms relieves the acquiring carrier, upon approval by the Commission of the acquisition, "from the operation of the antitrust laws . . . ." Although § 5 (11) does not authorize the Commission to "ignore" the antitrust laws, *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 80, there can be "little doubt that the Commission is not to measure proposals for [acquisitions] by the standards of the antitrust laws." 321 U. S., at 85–86. The problem is one of accommodation of § 5 (2) and the antitrust legislation. The Commission remains obligated to "estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed [acquisition] and consider them along with the advantages of improved service [and other matters in the public interest] to determine whether the [acquisition] will assist in effectuating the over-all transportation policy." 321 U. S., at 87.

Even though such acquisitions might otherwise violate the antitrust laws, Congress has authorized the Commission to approve them, if it finds they are in the public interest, "because it recognized that in some circumstances they were appropriate for effectuation of the national transportation policy. It was informed that this policy would be furthered by 'encouraging the organization of stronger units' in the . . . industry. And in authorizing those [acquisitions] it did not import the general policies of the anti-trust laws as a measure of their permissibility. It in terms relieved participants in appropriate [acquisitions] from the requirements of those laws. § 5 (11)." 321 U. S., at 85. It must be presumed that, in enacting this legislation, Congress took account of the fact that railroads are subject to strict regulation and supervision. "Against this background, no other inference is possible but that, as a factor in determining the propriety of [railroad acquisitions] the preservation of competition among carriers, although still a value, is significant chiefly as it aids in the attainment of the objectives of the national transportation policy." 321 U. S., at 85–86.

As respects railroad acquisitions, the Commission is not so bound by the antitrust laws that it must permit them to overbear what it finds to be in "the public interest." A contrary view would, in effect, permit the Commission to authorize only those acquisitions which would not offend those laws. "As has been said, this would render meaningless the exemption relieving the participants in a properly approved [acquisition] of the requirements of those laws . . . ." 321 U. S., at 86. Resolution of the conflicting considerations "is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission 'to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation,

but in its coordination of all other forms.' 79 Cong. Rec. 12207. 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed [acquisition] is 'consistent with the public interest.' Cf. *Interstate Commerce Commission* v. *Illinois Central R. Co.*, 215 U. S. 452; *Pennsylvania Co.* v. *United States,* 236 U. S. 351; *United States* v. *Chicago Heights Trucking Co.*, 310 U. S. 344; *Purcell* v. *United States,* 315 U. S. 381." 321 U. S., at 87–88.

Here, the Commission gave extensive consideration to the anti-competitive contentions advanced by appellants, devoting more than five pages of its report to that matter. It found that "[a]ll the carriers endeavoring to participate in its control are in competition with Western"; that the "important thing is not whether there is possibility of competition, but whether there is probability of existing or potential competition being diminished or strangled by the Western under the control of the Santa Fe and the Pennsylvania." After an extended analysis of the complex facts and conflicting evidence, the Commission found that control of Western by the Santa Fe and Pennsylvania would not result in any significant lessening of competition. It pointed to the fact that although the Santa Fe's "long haul" is to Chicago and the Pennsylvania's "next to longest haul" is also to Chicago (its longest haul being to St. Louis) the Santa Fe has agreed, and is bound, "to place Lomax on a parity with Chicago from a solicitation standpoint, and . . . the Pennsylvania will recognize Effner as one of its principal interchanges along with Chicago and St. Louis"; that "there may be some diversion of traffic, but such diversion would not jeopardize the maintenance of adequate transportation service by the objecting intervening carriers."

The Commission also pointed to the fact that Western had been in a prolonged receivership until 1927 when George P. McNear acquired its stock at a receiver's sale,

*Toledo, P. & W. R. Co. Acquisition,* 124 I. C. C. 181. It further found that Western's modern existence began at that time and, under the guidance of McNear, was built into a fine railroad; that since McNear's death, in 1947, the present management has continued, with much success, the policies he established. Those policies, the Commission found, were, and are, "to maintain strict neutrality between all connections, and to participate in any haul of traffic no matter how slight [as a bridge] carrier through Peoria as an alternative route, bypassing the congested terminals of Chicago and St. Louis," and that those policies are to be continued under the Santa Fe-Pennsylvania plan.

. We think it is clear from this summary of its analysis and findings that the Commission fully estimated the scope and appraised the effects of any curtailment of competition which might result from the acquisition of Western by the Santa Fe and Pennsylvania, and, after having done so, concluded that their acquisition and plan of operation of Western would not result in any significant lessening of competition. Congress has left the task of making that determination to the wisdom and experience of the Commission. The determination it has made rests· upon adequate findings which are, in turn, supported by substantial evidence and is well within the limits of its discretion under the Act.

. Appellants argue that the Pennsylvania, in actuality, contracted to purchase 50% of the Western stock from Wilmington Trust Company, a co-trustee of the McNear trust, and that, since four persons were directors of both companies, that proposed stock purchase violates § 10 of the Clayton Act; that the Commission was without power to approve it; that, in any event, its action in "condoning" it was an abuse of power; and that the District Court, for those reasons also, erred in upholding the Commission's order.

The Commission found that the Santa Fe in entering into the contract of May 26, 1955, with the trustees of the McNear trust was "acting on behalf of that carrier alone." But even if we assume, for present purposes, that it was acting as well for the Pennsylvania, the result must be the same. Section 10 of the Clayton Act prohibits a common carrier engaged in commerce from having "any dealings in securities" of more than $50,000, in the aggregate, in any one year, "with another corporation, . . . when the said common carrier shall have upon its board of directors . . . any person who is at the same time a director [of] such other corporation . . . , except such purchases [as] shall be made . . . by competitive bidding under regulations to be prescribed by [the] Commission." 38 Stat. 734, 15 U. S. C. § 20.

Section 10 of the Clayton Act is, of course, an antitrust law,[12] and much of what we have just said relative to the problem of accommodation of § 5 (2) of the Interstate Commerce Act and the antitrust laws is equally applicable to this contention. The evident purpose of § 10 of the Clayton Act was to prohibit a corporation from abusing a carrier by palming off upon it securities, supplies and other articles without competitive bidding and at excessive prices through overreaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest.[13] But, even if this purchase

---

[12] It is clear that § 10 of the Clayton Act is included in the "antitrust laws" referred to in § 5 (11) of the Interstate Commerce Act. Section 1 of the Clayton Act, 15 U. S. C. (1952 ed.) § 12, provides that "'Anti-trust laws,' as used in sections 12, 13, 14–21, and 22–27 of this title, includes sections 1–27 of this title." Moreover, § 5 (11) avoids any ambiguity by including "all other restraints, limitations, and prohibitions of law, Federal, State, or municipal."

[13] The legislative history of § 10 of the Clayton Act, though meager, supports the view stated in the text. In fact, the language of the several drafts of § 10, together with the types of abuses cited in

of securities might, under other circumstances, violate § 10 of the Clayton Act, Congress, by § 5 (11) of the Interstate Commerce Act, has authorized the Commission to approve it if it finds that so doing is in the public interest. And Congress has expressly said that, upon such approval, the carrier shall be relieved "from the operation of the anti-trust laws . . . ." A contrary view would, in effect, permit the Commission to authorize only those stock purchases which would not, in the absence of § 5 (11), offend the antitrust laws. "As has been said, this would render meaningless the exemption relieving the participants in a properly approved [acquisition] of the requirements of those laws . . . ." *McLean Trucking Co.* v. *United States, supra,* at 86.

Here, the Commission fully considered the contracts under which the Pennsylvania proposes to acquire a 50% interest in the Western stock and all other factors bearing on that matter and, after doing so, approved them. That action by the Commission did not exceed the statutory limits within which Congress has confined its discretion.

Minneapolis contends that § 5 (11) operates only *in futuro* and confers "no authority to purge the taint of a transaction illegal at the time it was brought to the Commission." Whether there is merit in that contention, as a legal abstraction, we need not decide, for here the existing contractual arrangements through which Pennsylvania asks authority to acquire 50% of the Western stock look entirely to the future. Neither the stock sale and purchase contract between the trustees and the Santa Fe nor the one between the Santa Fe and the Pennsyl-

---

support of its enactment, suggests strongly that the words "dealings in securities" were intended to cover only a carrier's dealings with related persons in its own securities. See H. R. Rep. No. 627, 63d Cong., 2d Sess., p. 3; S. Rep. No. 698, 63d Cong., 2d Sess., pp. 47–48; S. Doc. No. 585, 63d Cong., 2d Sess., pp. 8–9; 51 Cong. Rec. 15943.

vania Company is a consummated transaction, but each is expressly subject to, and, will become effective only upon, approval by the Commission. Apart from criminal prosecutions, with which we are not here concerned, it seems plain that approval of an acquisition by the Commission operates under § 5 (11), as that section says, to relieve the acquiring carrier "from the operation of the antitrust laws . . . ."

Appellants next contend that the Commission violated § 8 (b) of the Administrative Procedure Act by failing to make findings which, they think, were compelled by the evidence.

There can be no doubt that the Administrative Procedure Act applies to proceedings before the Commission, *Riss & Co.* v. *United States,* 341 U. S. 907, and see *Chicago & Eastern Illinois R. Co.* v. *United States,* 344 U. S. 917.

The last sentence of § 8 (b) provides:

> "All [administrative] decisions . . . shall become a part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof." [14]

Upon the basis of that language, appellants argue that the Commission should have found that the price which the Santa Fe agreed to pay for the Western stock of $135 per share was excessive. Though, the Commission made no express finding upon that matter it did discuss it, pointing out that the certified value of Western's properties for ratemaking purposes was more than $13,500,000; that it has no outstanding preferred stock and is relatively free of debt; that it has a fine earning record; that the transaction was at arm's length; that Minneapolis had

---

[14] 60 Stat. 242, 5 U. S. C. § 1007 (b).

offered $133 per share for the stock within a few days of the time when the Santa Fe contracted for its purchase at $135 per share; and that the Minneapolis sought author- ity in this proceeding to acquire the stock at the same price. The Commission concluded that if $135 per share was a fair price for the one it was also for the other.

Upon the same basis, appellants also argue that the Commission should have found that the Minneapolis application was in the public interest in that its acquisition of Western would greatly strengthen both Minneapolis and Western by eliminating many duplicating facilities and by reducing operating expenses by more than $1,770,000 annually. The Commission did not make a specific finding upon that matter, but it did give consideration to it and found that most of that saving—more than $1,300,000 annually—would be at the expense of Western's employees—a matter which, because of the express command of clause 4 of § 5 (2)(c) of the Interstate Commerce Act (see note 1), it evidently thought was not consistent with the public interest. Appellants further argue that the Commission should have found that the Minneapolis plan afforded adequate protection to Western's employees by providing for their absorption into the Minneapolis as attrition among its own employees permitted. Again, although the Commission made no specific finding upon that contention it did consider and discuss it, and we think the law required no more.

Appellants challenge the Commission's failure to make a number of other subsidiary findings, all of which have been considered, but we find that they relate to contentions that are so collateral or immaterial that the law did not require specific findings upon them. By the express terms of § 8 (b), the Commission is not required to make subordinate findings on every collateral contention advanced, but only upon those issues of fact, law, or

discretion which are "material." From a thorough examination of the record, we are persuaded that the Commission has made adequate subsidiary findings upon all material issues and has made the ultimate findings required by § 5 (2), that they support the Commission's order, and are, in turn, supported by substantial evidence.

Finally, appellants contend that the District Court, because of inadequate subsidiary findings by the Commission, was unable to, or at least did not, afford them a proper judicial review, and merely "rubber stamped" the Commission's order. Whether or not we approve all of the reasons and legal conclusions of the District Court, it is clear that it fairly considered and decided all of the issues raised by appellants, accorded to them a full and fair judicial review, and reached a right result. Accordingly the judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS dissents.