**John M. CLEARY, Appellant,**

v.

**O. Roy CHALK et al.**

**No. 71–1153.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 15, 1973.

Decided Nov. 12, 1973.

John M. Cleary, appellant, pro se.

Harvey M. Spear, New York City, with whom Manuel J. Davis, Washington, D. C., was on the brief, for appellee.

Before ROBINSON and WILKEY, Circuit Judges, and JAMESON,* Senior United States District Judge for the District of Montana.

---

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Section 10 of the Clayton Act[1] prohibits interstate common carriers and corporations with which they have interlocking directors from dealing in securities and articles of commerce aggregating in value more than $50,000 annually except on the basis of competitively-derived bids most favorable to the carrier.[2] Section 4 of the Act enables a person injured in his business or property by activity violative of the federal antitrust laws to sue for triple damages.[3] On appellees' motion, appellant's complaint invoking Section 4 for alleged infractions of Section 10 was dismissed by the District Court on the ground that

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Act of Oct. 15, 1914, ch. 323, 38 Stat. 730, as amended, 15 U.S.C. §§ 12 et seq. (1970).

2. Section 10, 15 U.S.C. § 20 (1970), provides:

 No common carrier engaged in commerce shall have any dealings in securities, supplies, or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership, or association when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership, or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. No bid shall be received unless the name and address of the bidder or the names and addresses of the officers, directors, and general managers thereof, if the bidder be a corporation, or of the members, if it be a partnership or firm, be given with the bid.

 Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding, or shall do any act to prevent free and fair competition among the bidders or those desiring to bid, shall be punished as prescribed in this section in the case of an officer or director.

 Every such common carrier having any such transactions or making any such purchases shall, within thirty days after making the same, file with the Interstate Commerce Commission a full and detailed statement of the transaction showing the manner of the competitive bidding, who were the bidders, and the names and addresses of the directors and officers of the corporations and the members of the firm or partnership bidding; and whenever the said commission shall, after investigation or hearing, have reason to believe that the law has been violated in and about the said purchases or transactions, it shall transmit all papers and documents and its own views or findings regarding the transaction to the Attorney General.

 If any common carrier shall violate this section, it shall be fined not exceeding $25,000; and every such director, agent, manager, or officer thereof who shall have knowingly voted for or directed the act constituting such violation, or who shall have aided or abetted in such violation, shall be deemed guilty of a misdemeanor and shall be fined not exceeding $5,000 or confined in jail not exceeding one year, or both, in the discretion of the court.

3. Section 4, 15 U.S.C. § 15, provides:

 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

it failed to state a claim upon which relief could be awarded.[4] We affirm.

I

From 1956 to 1973, D. C. Transit System, Inc. (Transit),[5] engaged as a common carrier of passengers in and between the District of Columbia and its Maryland and Virginia suburbs.[6] Between 1964 and 1970, Transit made six conveyances of improved parcels of real estate [7] which had been withdrawn from transportation operations after they had lost their usefulness therein.[8] Each conveyance was of a single parcel to a corporation in exchange for all of its capital stock.[9] Each was made at the property's book value—which exceeded Section 10's $50,000 ceiling—without competitive bidding. At the time of each transaction, Transit and at least five of the conveyees were interlocked in a fashion addressed by Section 10.[10] And at the inauguration of this litigation, all of the conveyees remained wholly-owned subsidiaries of Transit. These were the salient facts established on the record when the District Court acted.[11]

Appellant was a regular farepaying rider of Transit's vehicles.[12] In that role he sued for himself and the entire class of riders.[13] The theory of the complaint,

---

4. See Fed.R.Civ.P. 12(b)(6). See also notes 17, 53, 64, *infra*.

5. D.C. Transit System, Inc., is a District of Columbia corporation, and a wholly-owned subsidiary of D.C. Transit of Delaware, a Delaware corporation.

6. Act of July 24, 1956, Pub.L.No.757, 70 Stat. 598 (1956); National Capital Area Transit Act of 1972, Pub.L.No.92–517, 86 Stat. 999 (1972).

7. Three other conveyances between 1959 and 1962 and another in 1970—all to conveyees unassociated with Transit—are not involved in this litigation.

8. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S. App.D.C. ——, 485 F.2d 786 (1973); Bebchick v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. ——, —— – ——, 485 F.2d 856, 868–867 (1973); Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. —— – ——, 485 F.2d 886, 895–903 (1973).

9. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 8, 158 U.S.App.D.C. —— – ——, 485 F.2d at 829–831 ¶¶ 1–6.

10. The complaint alleges that Transit and five of the conveyees had common directors and officers. It makes no similar allegation respecting the sixth.

11. The facts we have recited, for the most part, were alleged in appellant's complaint. A few were established by an uncontradicted affidavit submitted on behalf of appellees, which the District Court was at liberty to consider. The motion to dismiss was treatable as a motion for summary judgment, Fed.R. Civ.P. 12(b); see also 2A J. Moore, Federal Practice ¶ 12.09 (2d ed. 1948); 5 C. Wright & A. Miller, Federal Practice § 1364 at 664–73 (1969); and the absence of any issue of material fact was evident. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157–160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Bloomgarden v. Coyer, 156 U.S.App.D.C. 156, 109, 479 F.2d 201, 206–207 (1973).

12. Prior to filing suit in the District Court, appellant sought to intervene in a proceeding pending before Transit's regulatory agency, the Washington Metropolitan Area Transit Commission, upon Transit's application for an increase in certain of its fares. At the time, appellant informed the Commission that he desired to test the validity of the conveyances by the requirements of § 10. The Commisson denied intervention but instructed its staff to investigate the matter, and the staff later reported that it found no evidence of § 10 violations to lay before the Commission. See D.C. Transit Sys., Inc. (Order No. 1090), 85 P.U.R.3d 508, 509–10 (WMATC 1970). After the Commission granted Transit a fare increase, D.C. Transit Sys., Inc. (Order No. 1052), 85 P.U.R.3d 1 (WMATC 1970), rev'd, Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App. D.C. ——, 485 F.2d 886, *supra* note 8, appellant sought reconsideration but apparently did not renew the antitrust objection. The Commission denied reconsideration, D.C. Transit Sys., Inc. (Order No. 1090), *supra*, and appellant filed a petition for review in this court, but on appellant's motion it was later dismissed with prejudice. The disposition we make eliminates any occasion to investigate the possible effect of those events upon appellant's suit.

13. The suit was instituted prior to the termination of Transit's franchise by public acquisition and consequent cessation of its transportation operations. See National Capital Area Transit Act of 1972, § 102(b), 86 Stat. 1001 (1972). Neither in its character as a

predicated squarely on Section 10, was that Transit had conveyed properties worth substantially more than the securities—the corporate stocks—received in return, and had divested itself of the earning power and loan value which those properties possessed, all to the detriment of Transit's customers in the form of higher fares.[14] For this the complaint sought treble damages,[15] and jurisdiction and standing to sue were rested exclusively on Section 4.

 In the view that the allegations of appellant's complaint did not provide a foundation for relief, the District

Court granted appellees' motion to dismiss.[16] On this appeal the parties have debated a number of points, but we find it necessary to address only the question whether the transactions described fell within the condemnation of Section 10. We answer that question in the negative.[17]

## II

The goal of the Federal antitrust laws is to safeguard the interplay of competitive forces in the far-flung commerce of the Nation.[18] The Sherman Act,[19] passed in 1890, "was designed to be a compre-

suit against Transit nor as one against its officers and conveyee-subsidiaries was it impaired by the takeover. See id. § 102(d), 86 Stat. 1001 (1972); Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, supra note 8, 158 U.S.App.D.C. at — – —, 485 F.2d at 828–829.

14. The defendants named are Transit, its parent corporation, the six subsidiaries, and directors and officers of those corporations.

15. See note 3, supra. Appellant advises us that he does not seek payment of damages to farepayers individually, which obviously is an impossibility. Instead, he would have any amount recovered in his lawsuit held and dispensed pursuant to court order for the benefit of users of the transit system. Compare, e. g., Bebchick v. Public Utils. Comm'n, 115 U.S.App.D.C. 216, 232–233, 318 F.2d 187, 203–204, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963). See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, supra note 8, 158 U.S.App.D.C. at — – —, 485 F.2d at 823–829.

16. See note 11, supra.

17. Appellees also mount a strenuous attack on appellant's standing to sue. The jurisdictional predicate of the suit is § 4 of the Clayton Act, which authorizes an action for treble damages by a "person . . . . injured in his business or property by reason of [conduct] forbidden in the antitrust laws." See note 3, supra. This language makes evident three basic requirements which appellant had to satisfy in order to achieve standing to maintain the action.

The first was sufficient allegation of injury to "business or property," and those words "refer to commercial interests or enterprises." Hawaii v. Standard Oil Co., 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972). One who in a business transaction purchases

an article is "injured in [his] property" when he is "led to pay more than the worth of the" article, Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906); "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." Id. Accord, Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 489–490, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). We have no doubt that a consumer of service who is illegally overcharged sustains a property injury no less than a consumer of goods. See Hawaii v. Standard Oil Co., supra, 405 U.S. at 262–264, 92 S.Ct. 885, Thomsen v. Cayser, 243 U.S. 66, 88, 37 S.Ct. 353, 61 L. Ed. 597 (1917). Appellant's complaint claims injury to Transit's riders as consumers in the marketplace of local transportation service.

Appellant, however, faced also additional requirements of § 4—injury in consequence of a violation of the antitrust laws. See Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 362 (9th Cir. 1955), and cases there cited. Section 10 is an antitrust law within the meaning of § 4, Clayton Act § 1, 15 U.S.C. § 12 (1970), but the more critical inquiries here are whether the activities asserted in appellant's complaint could have injured Transit's customers, and whether those activities would, if proven, fall within the scope and purpose of § 10. Thus standing to sue depends in part upon whether the case alleged in the complaint sufficed to charge an infringement of § 10.

18. United States v. Von's Grocery Co., 384 U.S. 270, 274–275, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); Northern Pac. Ry. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958); United States v. Reading Co., 253 U.S. 26, 57–58, 40 S.Ct. 425, 64 L.Ed. 760 (1920).

19. Act of July 2, 1890, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. §§ 1 et seq. (1970).

hensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade."[20] Its "fundamental purpose . . . was to secure equality of opportunity and to protect the public against evils commonly incident to destruction of competition through monopolies and combinations in restraint of trade."[21] The Clayton Act, adopted in 1914,[22] had these wholesome aims no less in view,[23] but sought its contribution to them through a regulatory technique of its own.

Unlike the Sherman Act, which broadly approached antitrust problems by outlawing consummated contracts and conspiracies, the Clayton Act specifically prohibits particular practices which are outside the ambit of the Sherman Act but nonetheless are steps toward the monopolistic ends which the latter had undertaken to forbid.[24] "[I]n passing the Clayton Act," Congress "sought to bring within the scope of its proscriptive provisions, conduct and practices which though dangerous to the competitive structure, were not covered at all or only inadequately covered by provisions of the Sherman Act."[25] It was intended "to supplement the purpose and effect of other anti-trust legislation, principally the Sherman Act of 1890;"[26] it "sought to reach the agreements embraced within its sphere in their incipiency, and

. . . to determine their legality by specific tests of its own."[27] In sum, by banishing designated practices, Congress endeavored to nip embryonic conspiracies and monopolies in the bud.[28]

■ That, which is so true of the Clayton Act, generally, is no less so of Section 10, which imposes the prohibition upon which appellant relies. In its features relevant to this case, Section 10 provides that:

No common carrier engaged in commerce shall have any dealings in securities . . . or other articles of commerce, . . . to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, . . . when the said common carrier shall have upon its board of directors or as its president, manager, or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager, or purchasing or selling officer of, or who has any substantial interest in, such other corporation, . . . unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise

20. Northern Pac. Ry. v. United States, *supra* note 18, 356 U.S. at 4, 78 S.Ct. at 517.

21. Charles A. Ramsay Co. v. Associated Billposters, 260 U.S. 501, 512, 43 S.Ct. 167, 168, 67 L.Ed. 368 (1923). See also United States v. Von's Grocery Co., *supra* note 18, 384 U.S. at 274–275, 78 S.Ct. 514; United States v. American Linseed Oil Co., 262 U.S. 371, 388–389, 43 S.Ct. 607, 67 L.Ed. 1035 (1923).

22. See note 1, *supra*.

23. See United States v. Von's Grocery Co., *supra* note 18, 384 U.S. at 274–275, 78 S.Ct. 514; International Shoe Co. v. FTC, 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431 (1930).

24. New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co., 332 F.2d 346, 350–351 ns. 5–6 (3d Cir. 1964), aff'd, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 337 (4th Cir. 1959);

United States v. United Shoe Mach. Co., 264 F. 138, 162 (E.D.Mo.1920), aff'd, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922).

25. Dictograph Prods., Inc. v. FTC, 217 F.2d 821, 826 (2d Cir. 1954), cert. denied, 349 U.S. 940, 75 S.Ct. 784, 99 L.Ed. 1268 (1955). See also United States v. National City Lines, 334 U.S. 573, 581, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948).

26. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 355, 42 S.Ct. 360, 362, 66 L.Ed. 653 (1922). See also United Shoe Mach. Corp. v. United States, *supra* note 24, 258 U.S. at 460, 42 S.Ct. 363.

27. Standard Fashion Co. v. Magrane-Houston Co., *supra* note 26, 258. U.S. at 356, 42 S.Ct. at 362.

28. New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co., *supra* note 24, 332 F.2d at 351 n. 6.

by the Interstate Commerce Commission.[29]

As we shall see, both the legislative history and a consistent course of judicial construction unveils Section 10 as "a narrowly drawn statute designed to meet a particular set of experienced evils."[30]

Section 10 followed in the wake of public concern over abuses flowing from interlocking directorates among railroads and their suppliers and bankers shortly after the turn of the century.[31] Interlocked office-holding in these industries created the potential for such activities as purchases by railroads at exhorbitantly high prices, issuance of railroad securities at exhorbitantly low prices, and loans to railroads at excessively high rates of interest.[32] President Wilson, in his message to Congress of January 20, 1914, proposed "laws which will effectively prohibit and prevent such interlockings of the *personnel* of the directorates of great corporations."[33] The House promptly responded with a bill which would have outlawed certain kinds of interlocks between carriers and bankers.[34] The Senate expanded the House version to cover dealings in supplies and other articles of commerce, but contrasted it by supplanting the total ban on interlocks with a requirement for competitive bidding.[35] In conference, the Senate bill prevailed,[36] and became Section 10 of the Act in the exact form in which it appears today.

So it is that, as the Supreme Court has observed, "[w]hile history shows a rather wide pattern of railroad misconduct leading to § 10, that section is a rather narrow prohibition applicable to activity that is conceptually within the antitrust philosophy."[37] For, as the Court has declared, "[t]he evident purpose of § 10 of the Clayton Act was to prohibit a corporation from abusing a carrier by palming off upon it securities, supplies and other articles without competitive bidding and at excessive prices through overreaching by, or other misfeasance of, common directors, to the financial injury of the carrier and the consequent impairment of its ability to serve the public interest."[38] It is clear, on the other hand, that Section 10 bars noncompetitive dispositions as well as noncompetitive acquisitions by carriers in transactions with an interlocked corporation.[39] It is equally clear, on the other hand, that the section is not to be extended to business activities which are not infected with the wrongdoing for which Congress intended redress.

## III

It is against the historical and adjudicative background of Section 10 that we must examine the case which appellant advanced in the District Court. In essence, it was as we have said,[40] a claim that Transit transferred illegally—that is, without competitive bidding —six parcels of real estate to six sub-

29. Section 10 is quoted in full in note 2, *supra*.

30. Klinger v. Baltimore & O. R.R., 432 F.2d 506, 516 (2d Cir. 1970) (concurring opinion).

31. See Five Per Cent Case, 31 I.C.C. 351 (1914); Financial Transactions of the New York, N. H. & H. R.R., 31 I.C.C. 32 (1914).

32. See the testimony of Mr. (later Justice) Louis D. Brandeis, who had been counsel in the *Five Per Cent Case*, *supra* note 31, Hearings Before the House Judiciary Committee, 63d Cong., 2d Sess., Trust Legislation, 1913–14, 679–80 (1914).

33. 51 Cong.Rec. 1963 (1914) (emphasis in original). See also H.R.No.627, 63d Cong., 2d Sess., 17–20 (1914).

34. H.R.Rep.No.627, 63d Cong., 2d Sess., 3, 17–20 (1914).

35. S.Rep.No.698, 63d Cong., 2d Sess., 47–48, 63, 69 (1914).

36. S.Doc.No.584, 63d Cong., 2d Sess., 13–14 (1914).

37. United States v. Boston & M. R.R., 380 U.S. 157, 162, 85 S.Ct. 868, 871, 13 L.Ed.2d 728 (1965).

38. Minneapolis & S. L. Ry. v. United States, 361 U.S. 173, 190, 80 S.Ct. 229, 240, 4 L.Ed. 2d 223 (1959) (footnote omitted).

39. See, *e. g.*, Minneapolis & S. L. Ry. v. United States, *supra* note 38; Klinger v. Baltimore & O. R.R., *supra* note 30.

40. See Part I, *supra*.

sidiaries at book value rather than true market value in return for securities—all of the capital stock—of the subsidiaries. In this fashion, appellant's complaint charged, Transit divested itself of assets for less than their fair value, and of the earning power those assets had and of the assistance they might have afforded Transit in obtaining loans to bolster its financial stability. Since these transactions occurred without competitive bidding, appellant insists that they fell within the purview of Section 10.

 It may be that the facts stated in the complaint could be jammed into the mold of the literal language of Section 10, but the ability to do so would not constitute the full proof of its applicability. "[L]iteralness may strangle meaning,"[41] and "[t]he decisions of [the Supreme] Court have repeatedly warned of the dangers of an approach to statutory construction which confines itself to the bare words of a statute."[42] We ourselves have had previous occasion to point out that "[t]he literal wording of [a] statute is . . . not the sole index to legislative intent,"[43] and that "[i]t cannot prevail over strong contrary indications in the legislative history;"[44] rather, as we have added, "[w]e must look through the statute itself to what

lay behind it."[45] These admonitions deserve special heed in Section 10 cases, wherein courts before us have recognized the hazards inherent in literal interpretation of that section.[46]

 Moreover, Section 10 not only augurs civil liability but criminal penalties as well.[47] So, as the Supreme Court has held, Section 10 is "[a] criminal statute [which] is to be construed strictly, not loosely."[48] We think the factor entitled to dominance in tightening the interpretation to be given Section 10 is the specific object which Congress had in mind in enacting it.[49] What Congress sought, we repeat, was protection against the draining away of carrier assets by noncompetitive acquisitions for which the carrier pays too much, or by noncompetitive dispositions for which it nets too little.[50] We turn, then, to the case at bar to ascertain whether the conveyances complained of impinged in that way on Section 10.

 One feature of the conveyances stands out indelibly. Each was made to a corporation in exchange for all of its capital stock. And both at the time of conveyance and at the time of suit, each corporate conveyee was a wholly-owned subsidiary of Transit. To be sure, the conveyances effected a legal transformation of Transit's ownership of real estate

41. Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 90 L.Ed. 1071 (1946).

42. Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962).

43. Lange v. United States, 143 U.S.App. D.C. 305, 307–308, 443 F.2d 720, 722–723 (1971) (footnote omitted).

44. *Id.* See also Salt River Project Agricultural Improvement & Power Dist. v. FPC, 129 U.S.App.D.C. 117, 121, 391 F.2d 470, 474, cert. denied, 393 U.S. 857, 89 S.Ct. 104, 21 L. Ed.2d 126 (1968) ; Shaffer v. Singh, 120 U.S. App.D.C. 42, 44, 343 F.2d 324, 326 (1965) ; Smither & Co. v. Coles, 100 U.S.App.D.C. 68, 70, 242 F.2d 220, 222, cert. denied 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1129 (1957).

45. Salt River Project Agricultural Improvement & Power Dist. v. FPC, *supra*, note 44, 129 U.S.App.D.C. at 121, 391 F.2d at 474.

46. See United States v. Boston & M. R.R., *supra* note 37, 380 U.S. at 160–162, 85 S.Ct.

at 868; Minneapolis & S. L. Ry. v. United States, *supra* note 38, 361 U.S. at 190–191, 80 S.Ct. 229 & n. 13; Klinger v. Baltimore & O. R.R., *supra* note 30.

47. See note 2, *supra*.

48. United States v. Boston & M. R.R., *supra* note 37, 380 U.S. at 160, 85 S.Ct. at 870.

49. See First Nat'l Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) ; United States v. CIO, 335 U.S. 106, 112, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) ; United States v. American Trucking Ass'ns, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) ; United States v. Maryland for Use of Meyer, 121 U.S. App.D.C. 258, 260, 349 F.2d 693, 695 (1965) ; Richmond, F. & P. R.R. v. Brooks, 91 U.S. App.D.C. 24, 27, 197 F.2d 404, 407, cert. denied, 344 U.S. 828, 73 S.Ct. 31, 97 L.Ed. 644 (1952).

50. See Part II, *supra*.

to ownership of stock, but in the practical sense Transit's position hardly changed at all.[51] Its complete ownership of the stock of the corporations having direct ownership of the realty was tantamount to continuing proprietorship of the realty.[52] By virtue of its exclusive power to control the subsidiaries, Transit retained full dominion over the properties. Its economic relationship to the properties after the conveyances was virtually the same as it had been before.

In these circumstances, we cannot agree with appellant that in making the conveyances Transit divested itself of the properties at less than fair value. Viewing the situation realistically, Transit simply did not depart with them. And certainly the post-transfer value of the stock which Transit acquired was equal to the value which the properties would have possessed had they remained as nonoperating assets in Transit's hands. Nor can we agree that Transit, or in turn its farepayers, lost either the earning power of the properties or the financial strength which they could impart to Transit's loan applications. The earnings of the subsidiaries in which the properties were titled, though retained, were the earnings of Transit, their parent.[53] As the record establishes, the financial statements of Transit and its corporate subsidiaries were consolidated for purposes of financial transactions. Indeed, some of the properties have been mortgaged and the proceeds used to support transportation operations.[54] No financial prejudice to Transit or its customers in consequence of the rearrangement of its property holdings is apparent.[55]

■ Beyond that, the grievances which appellant's complaint attributed to the conveyances were not bases for disapprobation by farepayers. It is one thing to say, as recently we have held, that upon removal of Transit's properties from operating to nonoperating status, its farepayers were entitled to consideration, in the fare-setting process, of value appreciations resulting solely from the interaction of market forces while the properties were dedicated to the public weal.[56] That point was not raised in the complaint which the District Court dismissed,[57] and in any event could not have affected the outcome of the litigation.[58] It is quite a different

---

51. As put by the Washington Metropolitan Area Transit Commission in dealing with appellant's petition for reconsideration, see note 12, *supra,*

> [T]he properties in question here have not been sold. They have been placed in nonoperating status and their title has been transferred to subsidiary companies, but those subsidiaries are wholly owned by Transit. Thus, Transit continues to own the property just as it always has. The only change is that the ownership occurs through holding all of the stock of the company having title, rather than retaining title directly.

D.C. Transit Sys., Inc. (Order No. 1090), *supra* note 12, 85 P.U.R.3d at 513.

52. Compare Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 607–608, 65 S.Ct. 829, 89 L.Ed. 1206 (1945) ; Kimberly Coal Co. v. Douglas, 45 F.2d 25, 27 (6th Cir. 1930) ; Socony-Vacuum Oil Co. v. Sheehan, 50 F. Supp. 1010, 1012 (E.D.Mo.1943), appeal dismissed, 144 F.2d 252 (8th Cir. 1944).

53. Compare Colorado Interstate Gas Co. v. FPC, *supra* note 52, 324 U.S. at 607–608, 65 S.Ct. 829.

54. D.C. Transit Sys., Inc. (Order No. 1090), *supra* note 12, 85 P.U.R.3d at 514.

55. So, even if the conveyances had fallen within the proscription of § 10, the absence of injury to farepayers would be fatal to appellant's action. *E. g.*, Klinger v. Baltimore & O. R.R., *supra* note 30, 432 F.2d at 516; Advance Business Sys. & Supply Co. v. SCM Corp., 415 F.2d 55, 63 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed. 2d 101 (1970) ; Winckler & Smith Citrus Prods. Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 n. 1 (9th Cir.), cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed. 2d 362 (1965). See also note 17, *supra.*

56. See cases cited *supra* note 8.

57. See, *e. g.*, Miller v. Avirom, 127 U.S.App. D.C. 367, 369–371, 384 F.2d 319, 321–323 (1967), and cases there cited.

58. A lowering of fares in consequence of the value appreciations could in no way have been hindered by the conveyances. See cases cited *supra* note 8. Nor could a failure to do so in any way implicate § 10. See Part II, *supra.* See also note 17, *supra.* It should

thing, however, to claim for farepayers, as the complaint did, the earnings and the loan value of assets after they have properly been removed from public service. Properties so withdrawn from then on are ordinarily outside the area of farepayers' concern, which is the reasonableness of the rates they are called upon to pay for the service.[59] It is well settled that income received by a public utility from nonoperating property is not to be considered in establishing the rate,[60] and in the setting of Transit's fares for public transportation that rule has been specifically observed.[61] And we perceive no ground upon which farepayers can legitimately object that the withdrawal of an asset no longer useful to transportation service has weakened the financial position of the carrier. The record before us discloses without contradiction that the properties in question were removed from transportation operations only after they had outlived their usefulness therein.

We conclude, then, that the challenged conveyances are free from the evil against which Section 10 was designed to protect. That evil is financial imposition upon the carrier,[62] and we can identify nothing of that sort in the property transfers under attack. It follows that appellant's complaint failed to state a claim under Section 10 upon which relief might be awarded,[63] and that the District Court was plainly right in dismissing it.[64] Its judgment doing so is accordingly

Affirmed.

---

be noted, however, that Transit's farepayers will benefit from the appreciation in value of in-service properties, though not on a treble-damages basis. See cases cited *supra* note 8.

59. See Washington Metropolitan Area Transit Regulation Compact, tit. II, art. XII, §§ 3, 6(a)(3), 74 Stat. 1031 (1960), as amended, 74 Stat. 765 (1962), and set forth following D.C.Code §§ 1–1410, 1–1410a (1973).

60. San Diego Gas & Elec. Co., 26 P.U.R.3d 129, 134 (Cal.Pub.Utils.Comm'n 1958); General Tel. Co., 29 P.U.R.3d 29, 47 (Fla.R.R. & Pub.Utils.Comm'n 1959); Union Elec. Light & Power Co., 17 P.U.R. (n.s.) 337, 388 (Mo. Pub.Serv.Comm'n 1937); Henderson Tel. Co., 36 P.U.R.3d 458, 462–63 (Nev.Pub.Serv. Comm'n 1960); Westchester Lighting Co., 15 P.U.R. (n.s.) 299, 315 (N.Y.Pub.Serv. Comm'n 1936). See also Peninsular Tel. Co., 17 P.U.R.3d 109, 114 (Fla.R.R. & Pub.Utils. Comm'n 1956); Baltimore Transit Co., 37 P.U.R.3d 1, 8 (Md.Pub.Serv.Comm'n 1961); Laclede Gas Light Co., 7 P.U.R. (n.s.) 277, 323 (Mo.Pub.Serv.Comm'n 1934); East Ohio Gas Co. v. City of Cleveland, 27 P.U.R. (n.s.) 387, 409–10 (Ohio Pub.Utils.Comm'n 1939); Commonwealth Tel. Co., 41 P.U.R. (n.s.) 78, 91–92 (Wis.Pub.Serv.Comm'n 1941).

61. D.C. Transit Sys., Inc. (Order No. 1090), *supra* note 12, 85 P.U.R.3d at 514–15.

62. See Part II, *supra*.

63. A similar course of reasoning leads also to the conclusion that appellant lacked standing to maintain this law suit. See note 17, *supra*. We need not consider the further question whether, particularly in view of the class-action feature of the complaint, see Hawaii v. Standard Oil Co., *supra* note 17, 405 U.S. at 266, 92 S.Ct. 885, its allegations overcame the objections discussed in Keogh v. Chicago & N. W. R.R., 260 U.S. 156, 162–165, 43 S.Ct. 47, 67 L.Ed. 183 (1922).

64. We are mindful of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *Accord*, Dollar v. Land, 81 U.S.App. D.C. 28, 30, 154 F.2d 307, 309 (1946). But appellant has not suggested, and we cannot perceive any set of facts which would sustain the specific claim asserted in his complaint.